

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00179-CR

_____

REBEKAH THONGINH ROSS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 354th District Court
Hunt County, Texas
Trial Court No. 29,269

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

# OPINION

As a result of an unlawful search of a home, Rebekah Thonginh Ross, an investigator for the Texas Department of Family and Protective Services (the Department or CPS), was indicted for official oppression.[1]  After a bench trial, Ross was found guilty, sentenced to one year in the Hunt County Jail, and fined $2,000.00.  The sentence was suspended, and Ross was placed on two years' community supervision, conditioned on her serving thirty days in jail.  On appeal, Ross contends (1) that the trial court erred because there was insufficient evidence to support her conviction, (2) that she was denied her constitutional right to a fair trial, and (3) that she was denied her constitutional right to effective assistance of counsel.  We affirm the trial court's judgment.

## I. Background

### A. The Department Proceedings

#### 1. The Petition and Supporting affidavit

On December 15, 2011, the Department filed a petition for orders in aid of investigation of a report of child abuse or neglect[2] and for a temporary restraining order under cause number 77600 in the 354th Judicial District Court of Hunt County.  Respondents in the cause were the parents of the child, Leslie Avery Hunt Vargas (Hunt) and Nicholas V. Vargas (Vargas).  The petition was supported by the affidavit of Ross.  In her affidavit, Ross averred that the Department had received a referral on December 12, 2011, stating that a child had been born at home and had not had

---

[1]*See* TEX. PENAL CODE ANN. § 39.03(a)(1) (West Supp. 2016).

[2]*See* TEX. FAM. CODE ANN. § 261.303(b) (West Supp. 2016) (authorizing court for good cause shown to order the parent or other person "in charge of any place where the child may be to allow entrance for the interview, examination, and investigation").

medical attention, that the mother was using drugs during her pregnancy, that the mother had had another child removed due to drug use, and that it was believed that the new child had been exposed to drugs.

The affidavit also stated that Ross had been assigned to the case on December 13, 2011, and detailed her investigation, which revealed that Hunt had two prior CPS cases, including one in which a child had been removed for drug use, and that she had been arrested for driving while intoxicated (DWI) two days before giving birth. In her affidavit, Ross stated that she had made contact with a couple present at the house located at 2321 Highway 69 South, Greenville, Texas, who stated that Hunt and Vargas had left moments before she arrived and that the child was believed to be with them. The couple confirmed that the child was born at home. The couple also said that Hunt and Vargas had a room in the house and that they assumed that the baby stayed in the room with them.

The affidavit further stated that, while talking with the couple, Ross smelled an odor of ammonia emanating from the house, which she averred is often found where methamphetamine is being manufactured. It also stated that several "collaterals"[3] had stated that they suspected the family to use and manufacture drugs and had warned her not to go to the residence alone. Finally, the affidavit also detailed Hunt's CPS and criminal histories.

---

[3]In her affidavit, Ross used the terms "collateral" or "collaterals," apparently to refer to other parties residing in the locations where the minor child's parents lived. It appears to be a shorthand reference to other persons who are present, but collateral to the CPS proceeding.

## 2. The Order In Aid of Investigation

The 354th District Court issued its order in aid of investigation of child abuse or neglect and temporary restraining order on December 15, 2011. The order provided, in relevant part:

3.1 **IT IS ORDERED** that a representative of the Department is authorized to enter the residence at 2321 Hwy 69 S, Greenville, TX, [and seven other addresses] where **UNKNOWN CHILD** is located, for an interview with and/or examination of **UNKNOWN CHILD,** and observation of the premises or immediate surroundings where **UNKNOWN CHILD** is located or where the alleged abuse or neglect occurred in a manner consistent with the provisions of § 261.302, Texas Family Code with assistance from Law Enforcement if necessary.

3.2 **IT IS ORDERED** that Law Enformcent [sic] accompany the Department to and inside the residence at 2321 Hwy 69 S, Greenville, TX, [and seven other residences], where **UNKNOWN CHILD** may be located by any means necessary.

## B. The Witness Testimony at Trial

### 1. Jessica Francis

At trial, Jessica Francis, who was also an investigator for the Department, testified that at 6:00 a.m. on December 16, 2011, she met Ross at the Highway 69 house to search for a newborn infant. Ross had been assigned to the investigation, and Francis was assisting her. Francis was aware that an order in aid of investigation had been entered, and she reviewed it when they arrived. In addition to Francis and Ross, two deputies from the Hunt County Sheriff's Office were present. The deputies broke down the door and went inside the residence to determine who, if anyone, was present. When they came back and told Francis and Ross no one was there, Ross went into the residence with the deputies.

4

Francis initially stayed outside, talking with another officer. After a while, Francis entered the residence to see why they were still there. Francis walked throughout the house and took photographs showing that the house had been evacuated and that the people had moved, apparently in a rush. She also spoke with Ross, who was in a bedroom. Ross and an officer were searching the bedroom—they had flipped up a mattress and were looking through a journal. Ross had Francis take a photograph of a scale and showed her a calendar where the mother had written that the baby was born at home.

According to Francis, the mattress had a big stain of bodily fluid or blood on its underside, and they assumed that is where the baby was born. Francis did not recall where the journal had been found, but she testified that Ross and the deputies had gone through drawers. Ross showed her some of the entries in the journal, but did not recall how extensively she looked at it. Francis felt all of the things that were being reviewed in the bedroom were to help them determine where the child could be and if it had been there. Based on what they found in the bedroom, Francis concluded that the baby had been there at some point and that Hunt had recently occupied the house.

Francis also testified that at some point they went into the kitchen, where Ross instructed the deputy to get a crock pot or a pot down from either a shelf or the refrigerator to look in it. Francis felt that this was beyond what was contemplated in the order in aid of investigation since they were no longer looking for the baby. She told Ross that there was not going to be a baby in the pot and that they needed to go find the baby, to which Ross responded, "Okay, Kenny." Francis

explained that Kenny Stillwagoner was a special investigator[4] with the Department and that Ross was implying that Francis was lazy. Francis also testified that the kitchen cabinets and drawers were also opened by either Ross or the deputies. It appeared to her that the deputies were working at Ross' direction throughout the house. One of the pots found in the kitchen had some residue dried up in it, and Ross commented that it might have been used for making drugs.

Based on the evidence in the bedroom, Francis concluded that the baby was not there, and Ross agreed with that conclusion. Francis felt like they were wasting time searching the rest of the house. A short time later, they went outside and talked with the deputies. They then contacted Stillwagoner to go with them to another residence to look for the child. Since she did not believe Ross was following the Department's policies, Francis reported the search of the kitchen to Ross' supervisor, Natalie Reynolds, as soon as they left the first residence, and later she reported the search to her own supervisor, Rochell Bryant.

Francis testified that they eventually located Hunt and the baby at the third residence they visited. The baby was very small, but there was nothing troubling about it at first glance. However, when they changed its diapers, they found that the umbilical cord had been tied with a shoestring. Francis began making telephone calls to get the baby seen by a medical professional, but Ross was making telephone calls to get a hair-follicle drug test approved for the baby. Ross told her that she wanted to make sure the baby was taken for the drug screening before being seen by a doctor.

---

[4]A special investigator receives the same Department training as an investigator, but is also either a current or former police officer.

6

On cross-examination, Francis testified that Ross was hired one month before her in 2008. She said that the residence where the incident took place was off of a county road. She agreed that the situation involving the newborn was an extraordinary case and that there was a sense of urgency to find the baby. She confirmed that she did not know who opened the drawers in the kitchen, just that she remembered Ross directing the deputies where to look. She testified that she did not have a problem with them initially looking around, just when they started looking into everything. She also acknowledged that the photographs of the mattress and box springs showed a lot of blood and bodily fluids. She denied that she and Ross had discussed that the baby may have died and stated that they had only discussed that the baby had been born there.

Francis said it never crossed her mind that the baby may have died there. She also testified that Ross discussed that drugs were being made in the house and looking into other areas to find evidence that drugs were being made in the house. Francis believed that Ross was concerned with gathering information about drug use. She also acknowledged that there was methamphetamine in the baby's system.

### 2.     Sandra Balderas

Sandra Balderas, the training academy manager for Region 3 of the Department, also testified. According to Balderas all new investigators go through seven weeks' training in the Department's CORE classes, then specialized training comprised of three weeks of classroom training and two weeks in the field. The training incorporates instruction on the Fourth Amendment, civil rights, and search and seizure in several different ways. All new hires take a computer-based training course entitled "Fourth Amendment Training." In addition, one of the

7

CORE classes is focused solely on the Fourth Amendment and is taught by a Department attorney. The legal aspects of the job are incorporated into every part of the training.

Balderas also testified that, according to her transcript, Ross had completed (1) the Basic Skills Development for CORE, which includes Fourth Amendment training, (2) the computer-based training "CPS and the Fourth Amendment, Respecting the Rights of Families," and (3) the "Basic Skills Development for CPS Investigators," which includes Fourth Amendment topics. She also testified that Ross took the course "CPS and the Fourth Amendment, Respecting the Rights of Families" a second time on November 4, 2008. Some of the Department attorney's course materials used at the time Ross went through training were also admitted into evidence. Balderas testified that the attorney-led presentation was standardized throughout the state.

Balderas acknowledged that among the training materials was one projector slide reading, "If we are going to perform a search or seizure we need: consent; a court order; or exigent circumstance," followed by additional projector slides applying those concepts. She also testified that to make sure the trainees understand that concept, the academy utilizes simulations and role-playing throughout the training. If someone has a problem understanding the training materials, that individual's supervisor is notified so the issue can be addressed during field training.

On cross-examination, Balderas explained that exigent circumstances are emergencies allowing the Department to take immediate action if a child could be hurt or injured in order to prevent further injury. She also testified that the order in aid of investigation in this case allowed access to the child at the residence, but if no child was present, she would not have done anything else. Balderas was unsure of whether the investigator training went into the details of an order in

8

aid of investigation. She acknowledged that, if an investigator had a court order, she could enter a house as long as entry complied with the order. She also acknowledged that, neither consent nor a court order is needed if there are exigent circumstances, but in that situation, the decision to enter the house would have to be made by the investigator and her supervisor.

After reading the petition and Ross' affidavit, Balderas did not agree that it was an extraordinary case. She testified that investigators are trained not to go into a house that is a possible "meth" house, as the affidavit indicated was the case with this house. She agreed that there was quite a bit of blood on the mattress and that that might lead an investigator to think something bad could have happened to the baby. Nevertheless, Balderas said that a Department investigator who entered the house and saw the blood on the mattress should not have searched the house since the child was not there. She also acknowledged that there is a difference between a search conducted by deputy sheriff and one conducted by a Department investigator and stated that it is not a Department investigator's job to tell a deputy what to do.

### 3. Kenny Stillwagoner

Stillwagoner, a former special investigator for the Department, testified that he worked in the same office as Ross. Before this incident, he had engaged in discussions with Ross regarding his assisting her in searching residences for narcotics. He related one incident involving a mobile home in which Ross had information that the people kept drugs in a crock pot above the kitchen cabinets. Ross wanted Stillwagoner to search the mobile home and, specifically, the area above the kitchen cabinets, but he refused, telling her that was not within the scope of their respective jobs. Her response was to tell him to "just do it." His refusal to do so became a source of tension

9

between them, and Ross quit asking him because she knew he would not do it. On cross-examination, he testified that these discussions took place within two years of the subject incident and that Stillwagoner got the impression on a number of occasions that Ross was all about violating people's civil rights.

### 4. Leslie Hunt

Hunt testified that she married Vargas in February 2011 and that she got pregnant shortly thereafter. She admitted to ingesting marihuana and alcohol during the pregnancy. She lived with Vargas at the Highway 69 house off and on for about a year and a half, and she gave birth in the house by herself. At the time, she was concerned that the Department would come looking for her and the baby.

Hunt testified that a few days after the birth, she was at a restaurant with Vargas and the baby and that Vargas received a telephone call informing him that the Department was looking for her and the baby. Vargas insisted that they try to go to Mexico and said that they could not stay at the house. She agreed with him at first, but she did not really want to do that. They returned to the house briefly, went to a hotel for two nights, and then went to a rental house.

Hunt said that she still had belongings at the Highway 69 house, such as a calendar, a journal, clothes, furniture, appliances, and food. She thought Vargas' brother owned the house, but she was not certain. She considered the highway 69 house to be the place she lived at the time the baby was born, although she left several days later.

Hunt denied that she gave anybody from the Department permission to search through the cabinets and drawers in the kitchen before she left the house. Hunt admitted that she and Vargas

consumed drugs at the Highway 69 house, but denied that methamphetamine was manufactured at the house. She stated that she did not know if Vargas dealt drugs.

On cross-examination, Hunt testified that it was Vargas' intent that, when they picked up their belongings, they would not return to the Highway 69 house. She played along, but confessed that she did not like the idea and that she snuck back when he was at work. She did not know what her intentions were because she did not want to go to Mexico and did not want to run. She acknowledged that she was not living at the house on December 16, 2011, and that she did not have a lease on the house. She also acknowledged that when they retrieved their belongings, Vargas was adamant about getting in and out of the house quickly because the Department might be coming.

Hunt admitted her main concern was that she did not want the Department to find that there was a lot of blood on the mattress, and she testified that Vargas turned the mattress over. She also agreed that there was blood and bodily fluids that sprayed onto the wall during the birth and that it looked like somebody had tried to kill somebody. Hunt had no idea that the Department had gone into the house and looked through it until she was subpoenaed for trial. She not only had no idea it would be illegal for the Department to do so, actually she thought the Department could legally do so. She also stated that, when she was arrested, she said to herself that she hoped she never had to return to the house.

### 5. Rochell Bryant

Rochell Bryant has been an investigative supervisor with the Department's Hunt County office since 2009. Bryant testified that she was Francis' supervisor and that Natalie Reynolds

11

supervised Ross. She was aware that Francis was helping Ross with an investigation involving a baby born at home in late 2011. Bryant estimated that the Department obtained orders in aid of investigation one or two times a month in Hunt County. She also knew that Ross had an order in aid of investigation for the case she was investigating.

Bryant also confirmed that Francis contacted her to express concern about some of the things that happened inside the house. As a result of Francis' comments, she contacted her program director, Laura Ard, but did not talk with Reynolds about it. Bryant explained that each new hire receives computer-based training on Fourth Amendment and search and seizure issues within thirty days, and again every twenty-four months thereafter. Based on her training, it is never proper to search through kitchen cabinets and drawers, but if there are case-specific allegations involving child safety, an investigator can ask a client to show them.

Bryant further testified that she has never heard of any other situation in which an investigator entered a home looking for a child when nobody was at home. She said that if nobody is at home, an investigator should not enter, but should check back later. She also testified that an order in aid of investigation does not allow an investigator to search for drugs and other contraband. If part of a referral suggests that there may be drugs in a home, it is not the investigator's responsibility to search for drugs when nobody is at home, even if the residence appears to be temporarily abandoned.

According to Bryant, the Hunt County office received training by a member of the district attorney's office in September 2012 to increase their knowledge of the Fourth Amendment. She believed that that training was either necessitated by or intended for Ross and Reynolds. On cross-

12

examination, Bryant testified that, until 2012, there was no Department training for investigators dealing with a situation in which a house is empty. She confirmed that she felt that the training by the district attorney's office resulted from some of the incidents that had taken place.

Bryant went on to say that she had personally entered a residence pursuant to a court order. She agreed that, in this case, there was a report of a baby born without medical care, that drugs were involved, that Hunt had a history with the Department, and that nobody knew if the baby was still alive. Yet, based on her training and under those facts, if nobody was home, she would have waited until somebody came home because she had no authority to enter the house when nobody was home. Bryant concluded that, even if she had the order in aid of investigation that Ross had obtained, she would not have entered the house when nobody was home.

Bryant also testified that she does not know if it was against the law for law enforcement to kick in the door and enter the house. She thought that the order's language—"by any means necessary"—empowered law enforcement and the Department to do whatever they thought was reasonable under the circumstances to make sure the child was safe. She agreed that the bloody mattress and wall could reasonably lead to the belief that the child was dead, but even if she thought that, she would not have gone through drawers or a crock pot. Based on the training Ross received, Bryant believed Ross would have known exactly what to do in that situation, which was to not go in the house and to contact her direct supervisor. Bryant did not know if Ross called her supervisor.

### 6. Teri Jones

Teri Jones was an investigator with the Department in Greenville from 2010 to 2013. She related an incident in 2010 during her training when she and Ross were conducting an investigation

13

together and Ross began looking in some kitchen drawers and cabinets when the client temporarily left the house. Jones asked Ross if that was what was usually done, and Ross replied, "[I]f we have the opportunity and there are drug allegations." She also testified that Ross had not asked for, and the client had not given, permission to perform the search. When she returned to the office, Jones asked her supervisor, Bryant, if they were supposed to do that, and Bryant said, "[A]bsolutely not." On cross-examination, Jones agreed that there was a rift between Bryant's team and Reynolds' team and that at times Bryant expressed her displeasure with what Reynolds and her team were doing.

## II.     The Appeal

On appeal, Ross brings eight points of error. Her first five points assert that the evidence is legally insufficient to support a finding that she intentionally subjected Hunt to a search that she knew was unlawful because (1) the search was lawfully conducted pursuant to a court order, (2) the search was lawful because of exigent circumstances, (3) if the search was not lawful, she did not know it, nor did she intend to conduct an illegal search, (4) the search was lawful because Hunt's rights were not violated, and (5) the only evidence showing Ross committed an unlawful search was uncorroborated accomplice-witness testimony. Ross also asserts that she was denied her constitutional right to a fair trial when the trial court quashed the subpoenas of the Department's attorney, Holly Peterson, and Hunt County First Assistant District Attorney Keli Aiken. Finally, Ross asserts that she received ineffective assistance of counsel because (1) trial counsel failed to request a hearing to determine whether she was the victim of selective prosecution and (2) trial counsel failed to object to the State's stipulation of evidence and failed to make a bill of error

14

regarding the proposed testimony of Peterson and Aiken.

We affirm the trial court's judgment because we find (1) that Francis was not an accomplice witness, (2) that there is sufficient evidence to support the judgment, and (3) that there has been no showing that Ross' constitutional rights to a fair trial and effective counsel were violated.

## III.     Francis Was Not an Accomplice Witness

In her fifth point of error, Ross contends that there was insufficient evidence to convict her of official oppression because the only evidence was the uncorroborated testimony of an accomplice witness, Francis. She points to Francis' testimony establishing that she entered the house of her own volition, that she took photographs in the house, including at Ross' direction, and that she looked through the journal with Ross. Francis also testified that she photographed the bloody mattress and wall and that she went into the kitchen area. Ross also points out that Francis testified that afterward, she went outside and discussed with Ross what they would do next and eventually drove Ross to two other residences until they found the child. Ross argues that that evidence shows that Francis assisted Ross before, during, and after the offense, making her an accomplice and that there is no other evidence showing Ross was even at the Highway 69 house that day.

A conviction in Texas cannot stand solely on the testimony of an accomplice witness. *See Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). Rather, Texas law requires that the testimony be "corroborated by other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). An accomplice is one who participates in the offense before, during, or after its commission with the requisite mental state.

15

*Smith*, 332 S.W.3d at 439 (citing *Druery v. State,* 225 S.W.3d 491, 498 (Tex. Crim. App. 2007));

*Bulington v. State*, 179 S.W.3d 223, 229 (Tex. App.—Texarkana 2005, no pet.). The accomplice

must have done some affirmative act promoting the commission of the offense. *Smith*, 332 S.W.3d

at 439; *Bulington*, 179 S.W.3d at 229. If the evidence shows a witness could be indicted (or if the

witness is indicted) for the same offense, or a lesser-included offense, as the accused, then the

witness is an accomplice as a matter of law. *See Smith*, 332 S.W.3d at 439. If there is doubt as to

whether the witness is an accomplice, then the fact-finder makes the determination as a fact issue.

*See id.* at 439–40. If the witness knew about the offense, but failed to report it, or helped to conceal

the offense, she is not an accomplice. *Id.* (citing *Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim.

App. 1987)).

The trial court made no findings of fact regarding whether Francis was an accomplice.

When the trial court does not file findings of fact, we imply those findings that support its ruling,

if the implied findings are supported by the record. *Flowers v. State*, 438 S.W.3d 96, 106 (Tex.

App.—Texarkana 2014, pet. ref'd) (citing *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim.

App. 2007)). We will uphold its ruling "on appeal if it is correct on any theory of law that finds

support in the record." *Id.* at 107 (quoting *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim.

App. 2006)).

In this case, the record supports an implied finding that Francis was not an accomplice

because she lacked the required culpable mental state. A person is a party to an offense if "acting

with intent to promote or assist the commission of the offense, he solicits, encourages, directs,

aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN.

16

§ 7.02(a)(2) (West 2011). This requires a showing that Francis had a "conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011). Therefore, to be an accomplice, Francis must have had a conscious objective or desire to promote or assist in the search of the kitchen and its contents. *See Meeks v. State*, 135 S.W.3d 104, 110–11 (Tex. App.—Texarkana 2004, pet. ref'd).

The only evidence in this case shows that, when Ross began her search of the kitchen, Francis objected to the search and expressed her objections to Ross. There was no testimony that Francis promoted or assisted in the kitchen in any way. In addition, Francis testified that she expressed her concerns later that day to both Ross and Ross' supervisors. Both the State and Ross contend that the actions of Ross and Francis taken prior to the search of the kitchen were allowed under the order in aid of investigation. Further, the fact that Francis drove Ross to two other residences in search of the child in no way shows that Francis promoted or assisted in the search of the kitchen and its contents.

Accordingly, there is no evidence showing that Francis had a conscious objective or desire to promote or assist in the search of the kitchen. Therefore, the record supports the trial court's implied finding that Francis was not an accomplice. Since she was not an accomplice, no evidence corroborating her testimony was required. We overrule Ross' fifth point of error.

17

**IV.     Legally Sufficient Evidence Supports the Trial Court's Judgment**

**A.     Standard of Review**

Legal sufficiency of the evidence[5] is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

Under the indictment and the statute, to convict Ross of official oppression, the State was required to prove beyond a reasonable doubt that, on or about December 16, 2011, (1) Ross, (2) while acting under color of her employment as an investigator for the Department, (3) intentionally (4) subjected Hunt (5) to a search and/or seizure (6) that Ross knew was unlawful. *See* TEX. PENAL CODE ANN. § 39.03(a)(1). As part of its case, the State was also required to show that the conduct of Ross was, in fact, unlawful. *State v. Edmond*, 933 S.W.2d 120, 127 (Tex. Crim. App. 1996). Ross challenges the legal sufficiency of the evidence showing that any search was unlawful, that she intended to conduct a search she knew was unlawful, and that Hunt had a reasonable expectation of privacy that was violated by the search.

**B.     Definition of "Unlawful"**

Section 39.01 of the Penal Code does not include a definition of "unlawful." *See* TEX. PENAL CODE ANN. § 39.01 (West 2011). However, Section 1.07 of the Penal Code defines "unlawful" as used in the Code to mean "criminal or tortious or both and includes what would be

18

criminal or tortious but for a defense not amounting to justification or privilege." TEX. PENAL

CODE ANN. § 1.07(a)(48) (West Supp. 2016). The Court of Criminal Appeals and our sister courts

have consistently applied this general definition of unlawful to Section 39.03 of the Penal Code.

*See Edmond*, 933 S.W.2d at 127; *Diaz v. State*, No. 09-13-00104-CR, 2014 WL 6983626, at \*5

(Tex. App.—Beaumont Dec. 10, 2014, pet. ref'd) (mem. op., not designated for publication);[6]

*Ryser v. State*, 453 S.W.3d 17, 26 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *Palacios v.*

*State*, No. 13-11-00254-CR, 2014 WL 3778170, at \*1 (Tex. App.—Corpus Christi July 31, 2014,

---

[5]In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the fact-finder "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Further, in a bench trial, the trial court "is the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony." *Joseph v. State*, 897 S.W.2d 374, 376 (Tex. Crim. App. 1995). We give "almost complete deference to [the fact-finder's] decision when that decision is based on an evaluation of credibility." *Thomas*, 444 S.W.3d 4, 11 (Tex. Crim. App. 2014) (quoting *Lancon v. State,* 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

In our review, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

[6]Although unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

no pet.); *Murrah v. State*, No. 02-10-00052-CR, 2011 WL 856960, at \*4 (Tex. App.—Fort Worth Mar. 10, 2011, no pet.) (mem. op., not designated for publication).

Nevertheless, the State asserts that we should ignore the definition found in the Penal Code, and instead define "unlawful" as "not authorized by law." The State cites no cases that have used its proposed definition. Rather, it argues that certain statements included in the State Bar Committee comments to its proposed 1970 draft of the Penal Code indicate that the drafters did not intend to require a public servant to commit a separate crime or tort.

The State points to other evidence that it says shows that the Legislature did not intend for the general definition of unlawful contained in Section 1.07(a)(48) to apply to official oppression. This evidence includes the lack of a cross-reference to the definition in Section 1.07 in the original draft of Section 39.03, comments in the Model Penal Code relating to official oppression, and some ambiguous comments contained in the committee minutes from 1968. The State argues that there would be practical problems in a jury trial if the Code's definition were used, i.e., having to prove up a separate crime or tort. Although the State recognizes that the courts of appeals in *Palacios* and *Ryser* used the statutory definition, it argues that the issue may not have been briefed.

"When we interpret statutes[,] . . . we seek to effectuate the 'collective' intent or purpose of the legislators who enacted the legislation." *Mahaffey v. State*, 316 S.W.3d 633, 637 (Tex. Crim. App. 2010) (quoting *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)). In determining legislative intent, "we necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment." *Id.* (quoting *Boykin*, 818 S.W.2d at 785). "If the meaning of the statutory text . . .

20

should have been plain to the legislators who voted on it, we ordinarily give effect to that plain meaning." *Id.* at 638 (quoting *Boykin*, 818 S.W.2d at 785).

Also, if a statute specifically defines a term, "we are bound by the statutory usage." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) (citing *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex. 2002)); *see also* TEX. GOV'T. CODE ANN. § 311.011(b) (West 2013); *Mahaffey*, 316 S.W.3d at 638–39. Therefore, we follow the plain meaning of the text of the statute, unless following the plain language would lead to absurd results or the language of the statute is ambiguous. *Mahaffey*, 316 S.W.3d at 638. In those instances, we may consider extra-textual factors such as legislative history. *Id.*

As noted earlier, the Legislature has provided a specific definition of "unlawful" in the Penal Code. *See* TEX. PENAL CODE ANN. § 1.07(a)(48). Section 1.07 provides that its definitions apply throughout the Penal Code. TEX. PENAL CODE ANN. § 1.07(a) (West Supp. 2016). Further, although Chapter 39 contains certain definitions specifically applicable to that chapter, it does not include a definition of unlawful. TEX. PENAL CODE ANN. § 39.01. When the Legislature omits words from a statute, we presume it did so purposefully. *See Jones v. State*, 979 S.W.2d 652, 657 (Tex. Crim. App. 1998); *Fahrni v. State*, 473 S.W.3d 486, 493 (Tex. App.—Texarkana 2015, pet. ref'd). Thus, under the plain, unambiguous language of the Penal Code, the definition of unlawful in Section 1.07(a)(48) is applicable to Section 39.03(a).[7] Further, applying the definition of

---

[7]This conclusion is confirmed when the original enactment of Chapter 39 and its subsequent amendment are examined. Both the definition of "unlawful" in Section 1.07 and Section 39.03 (formerly Section 39.02) were enacted in the same legislative session in 1973. *See* Act of June 14, 1973, 63d Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 888, 953 (amended 1975, 1977, 1979, 1987, 1989, 1991, 1993, 2003, 2009, 2013) (current version at TEX. PENAL CODE §§ 1.07(a)(48), 39.03(a)(1)). There was nothing in Chapter 39 or Section 39.03 (formerly Section 39.02) when originally enacted to indicate the Legislature intended a different meaning of "unlawful" for the purposes of Chapter 39 generally

unlawful found in Section 1.07(a)(48) will not lead to an absurd result in this case, nor has it lead to absurd results in other cases where it has been applied. *See Edmond*, 933 S.W.2d at 127; *Diaz*, 2014 WL 6983626, at *5; *Ryser*, 453 S.W.3d at 26; *Palacios*, 2014 WL 3778170, at *1; *Murrah*, 2011 WL 856960, at *4. Therefore, we find that the statutory definition of unlawful found in Section 1.07(a)(48) is applicable in this case.

As previously noted, the Penal Code defines "unlawful" to mean "criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege." TEX. PENAL CODE ANN. § 1.07(a)(48). Therefore, there must be sufficient evidence that the search and/or seizure of Hunt's property was criminal or tortious, that Ross knew it was criminal or tortious, and that her defense was inadequate to establish a justification or privilege. *See Ryser*, 453 S.W.3d at 26 (citing *Norris v. Branham*, 557 S.W.2d 816, 818 (Tex. App.—El Paso 1977, writ ref'd n.r.e.)); *Palacios*, 2014 WL 3778170 at *3. The Corpus Christi Court of Appeals has concluded that under this definition a defendant "is not guilty [of official oppression] . . . . if a justification or privilege existed for her acts." *Palacios*, 2014 WL 3778170, at *3 (citing TEX. PENAL CODE ANN. § 1.07(a)(48)). A party is justified when she "reasonably believes the conduct is required or authorized by law [or] by the judgment or order of a competent court." TEX. PENAL CODE ANN. § 9.21(a) (West 2011); *Palacios*, 2014 WL 3778170,

---

or of Section 39.03 specifically. This indicates that the Legislature intended to apply the general definition of "unlawful" found in Section 1.07(a)(48) to Section 39.03. Further, even though at least one court of appeals had applied the definition of unlawful in Section 1.07(a)(48) to the official oppression statute as early as 1983, *see Zuniga v. State*, 664 S.W.2d 366, 371 (Tex. App.—Corpus Christi 1983, no pet.), when Chapter 39 was amended in 1993 to add definitions specifically applicable to that chapter, the Legislature did not include a definition of "unlawful," *see* Act of June 19, 1993, 73d Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3673 (current version at TEX. PENAL CODE § 39.01).

22

at \*3.  A "reasonable belief" is defined as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor."

### C.    Sufficient Evidence Shows the Search was Unlawful

In her first and second points of error, Ross argues that there is insufficient evidence to support a finding that the search was unlawful because (1) she was acting under the authority of a lawful court order and (2) exigent circumstances justified her search of the kitchen and its contents. Ross concedes that the Fourth Amendment's guarantee of a person's right to be free from warrantless searches by the government applies to a social worker's investigations.[8]  She also does not contest that there was no search warrant issued in this case, but argues that the order in aid of investigation is the functional equivalent of a search warrant, citing *Pederson v. Klamath Cty.*, No. 1:12-CV-725-CL, 2014 WL 5018799, at \*4 (D. Or. Oct. 1, 2014, order); *Wernecke v. Garcia*, 591 F.3d 386, 395 (5th Cir. 2009); *Kia P. v. McIntyre,* 235 F.3d 749, 762 (2d Cir. 2000); *Tenenbaum v. Williams*, 193 F.3d 581, 603 (2d Cir. 1999); *J.B. v. Washington Cty*., 127 F.3d 919, 930 (10th Cir. 1997).[9]

---

[8]*See Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419–20 (5th Cir. 2008) (citing *Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 401 (5th Cir. 2002)).

[9]*Pederson* and *Wernecke* involved emergency orders granting temporary custody to a child protective agency. *Pederson*, 2014 WL 5018799, at \*1; *Wernecke*, 591 F.3d 386 at 388. *McIntyre* involved a temporary withholding of a newborn by a private hospital. *McIntyre*, 235 F.3d at 751.  *J.B.* involved an order allowing the child protective agency to temporarily remove the child from its home to conduct an interview.  *J.B.*, 127 F.3d at 922.  *Tenenbaum* stated in dicta that in the context of a child seizure during an abuse investigation, a court order is the equivalent of a warrant. *Tenenbaum*, 193 F.3d at 603.

Ross argues that the scope of the order in aid of investigation allowed her to enter and search all of the premises at the Highway 69 house to search for the newborn child. This included closets, drawers, cabinets, and the crock pot, where the newborn could be hidden. She also argues that, since the order in aid of investigation authorized her to locate and examine the child and the premises where the child was found or the abuse or neglect took place, she was authorized to search where the child might be hidden, and after discovering the bloody mattress, to search the premises where probable cause existed to believe abuse had taken place.

Alternatively, Ross argues that the search was lawful because of exigent circumstances.[10] She recognizes that probable cause must exist to enter the home and that the reasonableness of the emergency entry into the home is judged by the circumstances as they existed at the time the decision was made to enter.[11] Ross argues that when she saw the bloody mattress and the blood on the walls, together with her knowledge that a drug-addicted mother had given birth without medical assistance, and the allegations that the parents were manufacturing drugs, she reasonably believed that the child was in imminent danger, which justified the search of the home.

The State argues that an order in aid of investigation is not the functional equivalent of a search warrant, pointing out that an order in aid of investigation may be obtained on "good cause,"[12] whereas a search warrant requires probable cause. It also argues that an order in aid of

[10]*See Gates*, 537 F.3d at 420 ("Warrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." (quoting *United States v. Gomez–Moreno,* 479 F.3d 350, 354 (5th Cir. 2007))).

[11]*See id.*; *Spears v. State*, 801 S.W.2d 571, 574 (Tex. App.—Fort Worth 1990, pet. ref'd); *Winslow v. State*, 742 S.W.2d 801, 804 (Tex. App.—Corpus Christi 1987, writ ref'd).

[12]*See* TEX. FAM. CODE ANN. § 261.303(b).

24

investigation lacks the technical and substantive requirements for obtaining, issuing, and executing a search warrant found in the Code of Criminal Procedure.[13]  In addition, the State points out that no case has directly held that an order in aid of investigation is the functional equivalent of a search warrant.

However, the State concedes that the order authorized Ross and Francis to enter the house and the bedroom, contending that the only violation of the order was when Ross searched the kitchen cabinets, drawers, and pots after determining the baby was not in the residence.  The State points out that the order did not authorize a search, but only "observation of the premises . . . where the [child] was located or the alleged abuse or neglect occurred."  At oral argument, the State argued that "observation" should be construed to be the equivalent of "plain view."

The State also argues that there were no emergency circumstances that justified a search. It argues that any further search after discovering the conditions in the bedroom was not reasonable since the only testimony was that Ross and Francis interpreted the blood on the mattress and walls as evidence that the baby had been born there, and Ross never expressed an opinion or concern that the blood was evidence that the baby may have been killed.

### 1. The Order in Aid of Investigation Did Not Authorize Search of the Kitchen

Since the State only asserts that the search of the kitchen and its contents was unlawful, we need not decide whether the order in aid of investigation satisfied the Fourth Amendment's

---

[13]*See, e.g.*¸ TEX. CODE CRIM. PROC. ANN. arts. 18.01, 18.011, 18.02, 18.06, and 18.07 (West 2015 & West Supp. 2016).

25

requirement for a search warrant. Rather, an examination of the Family Code provisions authorizing the issuance of an order in aid of investigation shows that the search of the kitchen under the facts of this case was unlawful.

An order in aid of investigation may be issued to aid the Department in fulfilling its duty to investigate reports of child abuse or neglect. *See* TEX. FAM. CODE ANN. § 261.301–.316 (West 2014 & West Supp. 2016). This investigation may include a visit to the child's home and an interview and examination of the child. TEX. FAM. CODE ANN. § 261.302(a)(1), (2). The interview and examination of the child may "be conducted at any reasonable time and place, including the child's home or the child's school." TEX. FAM. CODE ANN. § 261.302(b)(1). If the investigator cannot gain access to the child, it may obtain an order in aid of investigation. Section 261.302 provides:

> (b)    If admission to the home, school, *or any place where the child may be* cannot be obtained, then for good cause shown a court having family law jurisdiction shall order the parent, the person responsible for the care of the children, or the person in charge *of any place where the child may be* to allow entrance for the interview, examination, and investigation.

TEX. FAM. CODE ANN. § 261.303(b) (emphasis added).

The purpose of the order in aid of investigation is to enable the Department's investigator to gain access to the child so it can interview and examine the child in furtherance of its duties to verify whether abuse or neglect has occurred.[14] Section 261.303(b) seeks to accomplish this

_____

[14]Thus an order in aid of investigation comes at a different stage and furthers a different purpose than the order for temporary conservatorship of a child considered in *Wernecke*. *See Wernecke*, 591 F.3d 386 at 393–94 (construing an order for temporary conservatorship of a child issued pursuant to TEX. FAM. CODE ANN. § 262.102 (West Supp. 2016)). A temporary conservatorship order is issued only after the Department's investigation has progressed to the point that the evidence shows that the child, or another child, has, in fact, been a victim of child abuse or neglect by a person in the child's household and immediate intervention by the Department is necessary for the protection of the child. *See*

purpose by authorizing the court to order the parent or any other person in charge of the place where the child is located to allow the investigator to enter and examine the child. At the same time, Section 261.303(b) contemplates that the order only authorizes entry into a place where the child "may be," i.e., where the child is located.

> The order of investigation in this case provided that the Department was
>
> authorized to enter the residence at 2321 Hwy 69 S, Greenville, TX, [and seven other addresses] *where UNKNOWN CHILD is located*, for an interview with and/or examination of **UNKNOWN CHILD,** and observation of the premises or immediate surroundings *where UNKNOWN CHILD is located* or where the alleged abuse or neglect occurred in a manner consistent with the provisions of § 261.302, Texas Family Code.

(Emphasis added). Although the order listed eight separate addresses where the child might be located, it only authorized entry into the residence where the unknown child was located. Thus, the entry into the residence authorized under the order is consistent with Section 261.303(b). After the child is located in the residence, the order states what the Department may do: it may interview and examine the child, and it may "observ[e] . . . the premises or immediate surroundings where the [child] is located or where the alleged abuse or neglect occurred."[15] These actions, like the entry authorized under the order, are dependent on the child being located in the residence.

In this case, both Ross and the State maintain that the initial entry into the residence and the actions taken in the bedroom were necessary to verify that the child was not located in the

---

TEX. FAM. CODE ANN. § 262.102(a)–(c) (West Supp. 2016). Further, a temporary conservatorship order may only be issued after the issuing court hears evidence and finds that child abuse or neglect has occurred and the child is in need of protection from a family member or a member of her household. TEX. FAM. CODE ANN. § 262.102(c).

[15]These actions are also consistent with Section 261.303(b), which allows "entrance for the interview, examination and investigation." TEX. FAM. CODE ANN. § 261.303(b). One of the investigatory duties of the Department is to determine "the adequacy of the home environment." TEX. FAM. CODE ANN. § 261.301(e)(5) (West Supp. 2016).

residence.   Assuming, without deciding, that those actions were authorized under Section 261.303(b) and the order,[16] we find that the subsequent search of the kitchen and its contents was not authorized under the order or the statute.  Francis testified that, based on what they saw in the bedroom, she and Ross concluded that the child had been there at one time, but that she was no longer there.

Further, Francis testified that she questioned the search of the kitchen, stating that the child was not there.  She also testified that Ross told her she wanted to search other areas for evidence that the parents had been making drugs.  That testimony was not contradicted.  Therefore, we find that there was sufficient evidence for the trial court to find that the search of the kitchen and its contents occurred after Ross determined that the child was not located in the residence.  Since that search occurred after it was determined that the child was not present in the residence, it was not authorized under the order or the statute and was, therefore, unlawful, unless an emergency justified the search.

---

[16]The Department's Petition for Orders in Aid of Investigation alleged, "The child . . . is believed to be residing with the mother and father. . . ."  In her supporting affidavit, Ross testified that, after receiving the initial report of abuse and neglect, she went to the residence named in the report.  She further testified that she spoke to a Hispanic female and a white male at the residence, that those individuals told her the parents had left the residence shortly before her arrival, and that "they believed the child was with them."  Thus, all of the information provided to the court issuing the order in aid of investigation indicated that the child was with the parents.

The purpose for an order in aid of investigation is to examine and/or interview a child alleged to be at risk of abuse or neglect.  In the absence of any information indicating that the child was present at the residence notwithstanding the absence of the parents, it is questionable whether any entry of the home by Ross was permitted once the deputies determined the parents were not present.  Nevertheless, the State does not challenge Ross' initial entry or any search of the residence prior to the search of the kitchen.  Since the question is not before us, we need not consider whether an order issued pursuant to Section 261.303(b) would have authorized Ross to enter the dwelling in the absence of information indicating that the child was, in fact, present.

28

## 2.   No Emergency Justified the Search of the Kitchen

Under the Fourth Amendment, "[w]arrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *Gates*, 537 F.3d at 420 (quoting *United States v. Gomez–Moreno*, 479 F.3d 350, 354 (5th Cir. 2007)).  While the exigent circumstances doctrine applies to the police in their crime-fighting role, the emergency doctrine applies when a state actor is acting to "protect or preserve life or avoid serious injury." *Laney v. State*, 117 S.W.3d 854, 861 (Tex. Crim. App. 2003) (citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).  Under the emergency doctrine, "[a] warrantless search may be justified by a need to act immediately to protect or preserve life or to prevent serious injury." *Bray v. State*, 597 S.W.2d 763, 764 (Tex. Crim. App. 1980).

Courts use an objective standard to assess whether a search is justified under the emergency doctrine. *Laney*, 117 S.W.3d at 862.  This standard looks at the state actor's conduct, taking into account the facts and circumstances known at the time of the search. *Id.*  We also "look to ensure that the warrantless search is 'strictly circumscribed by the exigencies which justify its initiation." *Id.* (quoting *Mincey,* 437 U.S. at 393)).  We recognize that "emergencies are inherently temporary," and when they come to an end, a further search is unjustified. *Bray*, 597 S.W.2d at 764.

The information available to Ross prior to entry, based on the affidavit attached to the petition, was that the child had been born at home several days earlier without medical attention, that the mother of the child had reportedly used drugs and alcohol during the pregnancy, and that

the mother previously had another child removed because of drug use. The affidavit also shows that the parents were suspected of manufacturing drugs in the house and that, two days before, a couple had confirmed that the parents and the child were staying at the house. Although Ross argues that she knew that the child was in imminent danger, she took the time to investigate, draft the affidavit, and wait for the order in aid of investigation before proceeding. Therefore, it appears that Ross did not have a reasonable belief before entering the residence that she needed to act immediately in order to protect or preserve the life of the child or to prevent injury.

The only additional factors that Ross cites to justify the search of the kitchen are the photographs of the bed with the blood and bodily fluid stains and Hunt's testimony that there was so much blood that it looked like someone had been killed. However, Francis testified that Ross found a calendar that indicated that the baby had been born at the home and that, based on what they found in the bedroom, they concluded that the baby had been born there and that it was probably someplace else. Also, Francis testified that they never discussed the possibility that the baby had died, but only discussed its birth. There is no evidence contradicting Francis' testimony.

All of this evidence would reasonably tend to confirm the information Ross set forth in her affidavit that the baby was born at home. Considering all of the circumstances and the facts known to the investigators at the time of the search of the kitchen, it would not be objectively reasonable to conclude that the blood and bodily fluid stains on the mattress were evidence that the baby had been killed or injured, as Ross contends.[17] Therefore, the evidence does not show that a

---

[17]Although Ross contends on appeal that she believed the baby may have been injured or killed based on the stains on the mattress, there was no testimony at trial supporting that contention.

warrantless search was justified by a need to protect or preserve life or to avoid serious injury.

Since the search occurred after it was determined that the child was not in the residence, it was not authorized under the order in aid of investigation, and since the evidence shows that the search was not justified under the emergency doctrine, we find that there was sufficient evidence to support the trial court's finding that the search was unlawful. We overrule Ross' first and second points of error.

**D.** **Sufficient Evidence Shows Ross Intended to Conduct a Search She Knew was Unlawful**

In her third point of error, Ross contends that there is insufficient evidence that she intended to conduct a search she knew was unlawful. She points out that part of the State's burden is to establish beyond a reasonable doubt that she knew that the search was unlawful, i.e., that it was criminal, tortious, or both. In addition, she contends that she cannot be guilty of official oppression if a justification or privilege exists for her conduct. She argues that, based on her training, she reasonably believed that the order in aid of investigation authorized her entry into the home and that the blood on the mattress and walls constituted exigent circumstances that justified continuation of her search. This, she reasons, shows she only intended to conduct a lawful search.

She further contends that the evidence of the training she received on the Fourth Amendment shows that she was taught that she could conduct a search if she had consent, a court order, or exigent circumstances, but without further elucidation of what those entailed. She argues that subjective testimony of what others would have done based on the same training revealed contradictory answers, so that there was no clear answer for what she should have done under the circumstances. Thus, she concludes, the evidence shows that she could not have known, based on

her training, what course of action would be considered lawful and, therefore, she did not have a "fair and clear warning" that her conduct was unlawful.

It was not sufficient for the State to merely show that the search was unlawful. In addition, the State had the burden of proving beyond a reasonable doubt that Ross knew her acts were criminal, tortious, or both. *Palacios*, 2014 WL 3778170, at *3–4. It also had the burden of persuasion to show that Ross' conduct was not justified or privileged. *See Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Lee v. State*, 415 S.W.3d 915, 919 (Tex. App.— Texarkana 2013, pet. ref'd). If Ross reasonably believed that her conduct was required or authorized by law, or by a judgment or order of a competent court, her actions were justified. *See Palacios*, 2014 WL 3778170, at *4; TEX. PENAL CODE ANN. § 9.21(a). A reasonable belief is one "that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42).[18]

Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone. *Ramsey*, 473 S.W.3d at 809; *Hooper*, 214 S.W.3d at 13 (citing *Guevara*, 152 S.W.3d at 49). Therefore, both intent and knowledge may be inferred "from any facts which tend to prove [their] existence, including the acts, words, and conduct of the accused." *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)).

---

[18]Ross did not testify or call any witnesses. We assume that her cross-examination of the State's witnesses in this case was sufficient to raise the justification defense without deciding that issue.

Initially, we determine whether there is sufficient evidence to support a finding that Ross knew that the order in aid of investigation did not authorize the search of the kitchen and its contents, or that she could not have reasonably believed that the order authorized that search. The State points to the training Ross received to show that she knew the search of the kitchen was unlawful. The only evidence of that training was the testimony of Balderas and the training materials from the presentation on the Fourth Amendment by the Department's attorney.

Twenty-one training slides were entered into evidence at trial dealing with a search of a home as it relates to the Fourth Amendment. The slides warn that, "[i]f a CPS worker violates the 4th amendment, qualified immunity may not apply, and a caseworker can be exposed to personal liability." The text of the Fourth Amendment is set forth, then the slides state that the Fourth Amendment comes into play "[w]hen CPS performs a search (entering a home or inspecting another place where a person has a reasonable expectation of privacy)."

The presentation gave two examples of a search: entering and remaining in a family's home, and visually examining a child. The slides then set forth the standard and the one message to take away from the training:

If we are going to perform a search . . . ., we need:

- **Consent**

- A **court order**, or

- **Exigent circumstances** . . . .

In addressing specific applications, the slides advised that to enter a family's home, the Fourth Amendment requires either consent (agreement) for entry, a court order, or exigent (emergency)

33

circumstances.  The presentation included five slides dealing with issues surrounding consent.  The last slide on consent advised the trainee that if there is a question about consent, she should not rely on consent to enter the home.  It goes on to admonish the trainee,

But you should still protect the children so

➢ Seek a court order specifically allowing entry, or

➢ Determine whether exigent circumstances exist

The slides further advised the trainee that, if the parent denies entry to the home or an interview with the children, then she is to determine if she needs a court order allowing entry and an interview of the children or whether there are exigent circumstances.  The slides also stated that, if CPS can show good cause, a court can issue an order in aid of investigation to enter the home and/or interview the child.  The slides informed the trainee that exigent circumstances exist to enter the home if, based on the totality of the circumstances, there is reasonable cause to believe that there is an immediate danger to a child in the home, and the purpose of the entry is to protect the child.

No one testified regarding any additional specifics which may have been addressed by the attorney making the presentation.  However, the training slides did inform the trainee that a search includes entering the home and inspecting any place where a person has a reasonable expectation of privacy.  They also warn the trainee that she can be subjected to personal liability if she violates a person's Fourth Amendment rights.  The slides also addressed two aspects of a search under the Fourth Amendment:  (1) entering and remaining in a family's home and (2) examining or interviewing a child.  If the investigator is denied access to either the home or the child, the slides

advised her to obtain a court order allowing entry into the home and an interview of the child. However, nowhere did the slides suggest that an order may be obtained that allows a search of the home.

Balderas testified that the order allowed Ross to enter the residence to locate the child. However, Bryant testified that an order in aid of investigation does not authorize entry into a residence when nobody is home. Although Ross emphasizes what she sees as the inconsistency between Balderas' and Bryant's testimony regarding entry into the home, neither they nor Francis testified that the search of the kitchen and its contents was authorized by the order. To the contrary, all of them testified, based on having received the same training as Ross, that the search of the kitchen and its contents was not authorized by the order. We have previously discussed the fact that any observation of the premises authorized by the order was dependent on the child being located at the residence. The testimony of Balderas, Bryant, and Francis exhibits a similar understanding of the order.

Further, Francis testified that Ross discussed with her that the purpose of the search was to find evidence that drugs were being manufactured in the house. When Francis objected that they should be looking for the child, Ross compared her to Stillwagoner, who had previously refused to search for drugs at Ross' request, and had told Ross that searching for drugs was not part of their job duties.

We have previously addressed the issue of whether Ross could have reasonably believed that emergency circumstances existed justifying the search and concluded that she could not. However, Ross also contends that the inadequacy of her training and the inability of Balderas to

define exigent circumstances shows that she could not have known that the search of the kitchen was unlawful. First, we note that although Balderas could not offer a definition of exigent circumstances, she gave two examples of situations in which a child's life or safety were in imminent peril that would justify immediate action by an investigator. Those examples demonstrated that she understood, based on her training, the emergency doctrine.

In addition, the training slides clearly set forth the parameters of exigent circumstances that would justify immediate action by an investigator, namely, when, based on the totality of the circumstances, there is reasonable cause to believe that there is an immediate danger to a child in the home and the purpose of the entry is to protect the child. As we have seen, based on the totality of the circumstances and facts known to Ross at the time, no reasonable cause existed to believe either that the child was in immediate danger, or that the baby was in the home. Further, the only testimony was that the purpose of Ross' search of the kitchen and its contents was to search for evidence of drugs, not to protect the baby.[19]

---

[19]Ross also argues that the evidence shows that she did not have a "clear and fair warning" that her conduct was unlawful, citing *United States v. Lanier*, 520 U.S. 259 (1997). The concept of a defendant having a fair warning that her conduct is unlawful is based on due process and founded on the principle that no person should "be held criminally liable for conduct which he could not reasonably understand to be proscribed." *Id.* at 265 (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)). Under a federal statute analogous to Section 39.03, the United States Supreme Court has held that criminal liability may be imposed under the statute "for deprivation of a constitutional right if, but only if, 'in the light of pre-existing law the unlawfulness [under the Constitution is] apparent.'" *Id.* at 271–72 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In this case, the unlawfulness of a warrantless search by a Department investigator, absent consent or exigent circumstances with probable cause was apparent under existing law. *See Gates*, 537 F.3d at 420 ("Warrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." (quoting *United States v. Gomez–Moreno,* 479 F.3d 350, 354 (5th Cir. 2007))). Also, as we have seen, the parameters of a search justified by the emergency doctrine have been established under pre-existing law. *See, e.g.*, *Laney*, 117 S.W.3d at 861–62. Further, as previously discussed, the statute authorizing the issuance of an order in aid of investigation clearly only allows the Department to enter a place where the child may be. *See* TEX. FAM. CODE ANN. § 261.303(b). The testimony of Balderas, Bryant, and Francis shows that they clearly understood that, under the order, the investigator must leave once it was determined that the baby was not in the residence. Therefore, we find that Ross had a clear and fair warning that her search of the kitchen was unlawful.

Viewed in the light most favorable to the trial court's judgment, the trial court could reasonably infer from this evidence that Ross knew that the order did not authorize the search of the kitchen and its contents, and that she could not have reasonably believed the order authorized her to search the kitchen and its contents. Further, the trial court could reasonably infer that Ross knew the search was tortious since her training informed her both that a search included inspecting a place where a person had a reasonable expectation of privacy and that, if she violated a person's Fourth Amendment rights, she could be personally liable. Therefore, we find there is sufficient evidence to support the trial court's finding that Ross intended to conduct a search that she knew was unlawful. We overrule Ross' third point of error.[20]

### E. Sufficient Evidence Shows that Hunt Had a Privacy Interest in the House

In her fourth point of error, Ross challenges the sufficiency of the evidence to support the trial court's finding that Hunt had a justifiable, reasonable, or legitimate expectation of privacy. Ross argues (1) that Hunt abandoned the Highway 69 house, (2) that she had no reasonable expectation of privacy in the residence at the time of the search, and (3) that the State was improperly attempting to assert Hunt's Fourth Amendment rights, since Hunt was not even aware of the search until shortly before trial.

---

[20]Although the State was required to prove that Ross subjectively knew that the search was unlawful, the judge, as fact-finder, could make that finding on this record based on the training and information provided to Ross, her co-workers' and supervisors' understanding of that information, and her co-workers' refusal to assist in her previous searches. This constitutes circumstantial evidence that Ross had the same knowledge her co-workers did, and therefore, had subjective knowledge that her search was unlawful.

### 1.     Sufficient Evidence Shows Ross Did Not Abandon the House

A person who voluntarily abandons property may not contest the search of the property since she no longer has a reasonable expectation of privacy in it. *See Swearingen v. State*, 101 S.W.3d 89, 101 (Tex. Crim. App. 2003). "Abandonment of property occurs if the defendant intended to abandon the property and his decision to abandon it was not due to police misconduct." *McDuff v. State*, 939 S.W.2d 607, 616 (Tex. Crim. App. 1996) (citing *Brimage v. State,* 918 S.W.2d 466, 507 (Tex. Crim. App. 1996) (op. on reh'g)). "The proper inquiry is whether the defendant 'voluntarily discarded, left behind, or otherwise relinquished his interest in the property' such that he no longer possesses a 'reasonable expectation of privacy' in the property 'at the time of the search.'" *Holden v. State*, 205 S.W.3d 587, 589 (Tex. App.—Waco 2006, no pet.) (quoting *McDuff*, 939 S.W.2d at 616). "All relevant circumstances existing at the time of the alleged abandonment should be considered." *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973) (citing *United States v. Manning*, 440 F.2d 1105, 1111 (5th Cir. 1971)).

In this case, the testimony was conflicting regarding whether Hunt abandoned the Highway 69 house and its contents. Francis testified that she walked throughout the Highway 69 house and took photographs showing that the house had been evacuated and that the people had hurriedly left. Hunt testified that she and her husband lived at the house off and on for about one and one-half years. She also testified that they lived there when the baby was born, but moved from it several days later after finding out that the Department was looking for them.[21]  Her husband

---

[21]Ross does not contend that there was insufficient evidence to support an implied finding that shortly before the search by Ross, Hunt had a reasonable expectation of privacy in the residence.

38

wanted to flee to Mexico, and she testified that they returned briefly to the house to quickly gather some of their belongings. After that, they stayed in a motel for several days, then stayed at another house, where they were located by the Department.

Yet, Hunt also testified that she still had belongings at the Highway 69 house, such as a calendar, a journal, clothes, furniture, appliances, and food. Although it was her husband's intent that when they picked up their belongings, they would not return to the Highway 69 house. Hunt did not like the idea and snuck back to the house when he was at work. Hunt acknowledged that she did not know what her intentions were, but she also testified that she did not want to go to Mexico and did not want to run. Hunt also acknowledged that she was not living at the house on December 16, 2011, and that she did not have a lease on the house.

In a bench trial, it is the trial court's role, as the fact-finder, "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper*, 214 S.W.3d at 13 (citing *Jackson*, 443 U.S. at 318–19). Although Hunt left the house, she also testified that she returned at least once, and that she still had personal property at the house. Further, Hunt was unclear regarding whether she intended to leave the house permanently. This is some evidence that she did not intend to relinquish her interest in the property. Therefore, the trial court could reasonably infer that her conduct indicated that she did not intend to abandon the house and her personal property. When viewed in the light most favorable to the trial court's implied finding that Hunt did not abandon the residence and its contents, we find there is legally sufficient evidence to support that finding.

39

## 2. Hunt Retained a Reasonable Expectation of Privacy

In her second argument, Ross argues that, even if Hunt did not abandon the house, she had no expectation of privacy in the residence. She points out that Hunt testified that she knew the Department was looking for her and the child and that that is why she cleaned the bathroom and why Vargas flipped the mattress. This, she argues, shows that Hunt had no expectation of privacy in the residence and that, therefore, there was no Fourth Amendment violation.

Ross cites no caselaw or other authority supporting her argument, which essentially posits that a person loses her expectation of privacy in her residence if she temporarily absents herself from her residence to avoid being interviewed by a government employee. We have found no authority that supports this proposition. Rather, the United States Supreme Court has noted that "physical entry of the home is the chief evil against which the . . . Fourth Amendment is directed." *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972). The Court of Criminal Appeals, also, has stressed that "'[a]t the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Long v. State*, 132 S.W.3d 443, 450 (Tex. Crim. App. 2004) (quoting *Kyllo v. United States,* 533 U.S. 27, 31 (2001)). Since the trial court impliedly found that she had not abandoned her residence and its contents, Hunt retained her reasonable expectation of privacy in the house and its contents.

## 3. Assertion of Hunt's Fourth Amendment Rights by the State

In her third argument, Ross argues that, since Fourth Amendment rights may only be enforced by the person whose rights were violated, the State could not assert a violation of Hunt's rights when Hunt did not complain and was not aware that they had been violated. She points to

40

Hunt's testimony that she was not aware of the search or that it may have been illegal until shortly before trial. Since Hunt was not complaining, Ross argues, the State could not unilaterally enforce her rights for her.

Again, Ross cites no direct authority in support of this argument. Rather, she relies on cases in which a defendant is implicated in a crime as a result of the search of a third party's property, and the defendant seeks to suppress the evidence. *See, e.g.*, *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (non-owner passengers in automobile held not to have standing to contest legality of search of the automobile); *Alderman v. United States*, 394 U.S. 165, 171–72 (1969) (reaffirming that "the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself"). However, one of the primary reasons the Supreme Court has refused to grant standing to those defendants whose personal rights were not violated is that it would have a deleterious effect on law enforcement by expanding the exclusion of evidence obtained in the search. *See Rakas*, 439 U.S. at 137–38; *Alderman*, 394 U.S. at 174–75.

There is no such consideration in a case prosecuted under Section 39.03(a)(1) of the Penal Code. Further, Section 39.03(a)(1) criminalizes the conduct of the public servant who "intentionally subjects another to mistreatment or arrest, detention, search [or] seizure . . . that he knows is unlawful." TEX. PENAL CODE ANN. § 39.03(a)(1). There is nothing in that section that requires the person subjected to the unlawful search to complain or to be aware that the conduct was unlawful. Further, this offense, as all offenses under the Penal Code, is an offense against the

41

State of Texas.  *See* TEX. CODE CRIM. PROC. ANN. art. 21.02 (West 2009).  Therefore, we find

Section 39.03(a)(1) of the Penal Code gave the State standing to prosecute this action against Ross.

For these reasons, we find that there was sufficient evidence to support the trial court's

implied finding that Hunt had a reasonable expectation of privacy in the residence and its contents.

We overrule Ross' fourth point of error.

## V.      The Trial Court Did Not Deny Ross a Fair Trial

In her seventh point of error, Ross contends she was denied her constitutional right to a fair

trial when the trial court quashed her subpoenas for the Department's attorney, Holly Peterson,

and Hunt County First Assistant District Attorney Keli Aiken.  Ross argues that she had

subpoenaed both of these witnesses for trial that was originally scheduled for February 23, 2015,

and that at a hearing to suppress those subpoenas, the trial court made it clear that it was going to

sign an order quashing the depositions if the State submitted a stipulation of testimony.  She argues

that any further complaint would have been futile and that, as a result, she was denied the right to

bring witnesses on her own behalf and the right to cross-examine witnesses.

### A.      Background

Jury selection in this case was originally set for February 23, 2015.  Around February 3,

2015, Ross served Peterson and Aiken with subpoenas to appear and provide testimony at trial.

The State filed a motion to quash the subpoenas, asserting that any testimony by these witnesses

was protected by the attorney-client privilege or by attorney work product.  A hearing was held on

the motion to quash on February 9, 2015.

42

At the hearing, Ross argued that she needed testimony from Peterson that she drafted the petition for the order in aid of investigation, as well as the order, and presented them to the trial court. She argued that she needed testimony from Aiken that the Fourth Amendment training she gave to the Department's Hunt County office occurred eleven months after the incident alleged in the indictment. After argument by the State, the following exchange took place:

> THE COURT: Now, I want to think about it but my inclination is to grant the motions to quash if the State is willing to stipulate the fact of the training as to Ms. Aiken, the training -- and when the training was, obviously the time frame, and that Ms. Peterson prepared the motion, the -- as a basis of that motion, the order was signed and the Defendant and others went to the house where the alleged unlawful search and seizure occurred. Those are all facts, I think, can be stipulated to without the necessity of having those people testify. . . . Mr. Schulte, with that kind of stipulations then the Court would grant the motion to quash.
>
> . . . .
>
> [Defense Counsel]: Judge, just for the record so in that regard we can't reach an agreement, obviously, before then, and can we still state that those subpoenas are still active. If we have to deal with it Monday morning, the 23rd, we will but I just -- I don't want them making other plans except to be in court --
>
> THE COURT: No, until I -- until I sign an order quashing -- they're still active.
>
> [State's Counsel]: So an order to quash would have to be accompanied by a stipulation that we draft. Is that what the Court's saying?
>
> THE COURT: (Nods head).
>
> [State's Counsel]: Okay. I will do that and we'll have something --
>
> [Defense Counsel]: That we agree upon.
>
> [State's Counsel]: Well (ha-ha) I think the Judge is going to order it.
>
> THE COURT: You can each submit, if -- if you don't like their draft of the stipulations, you can submit one.

43

[Defense Counsel]:  Okay.

THE COURT:  Of course, on a stipulation I can't force -- both sides to sign it and – but if their draft of the stipulation, I think, gives you essentially what you need, then I'll quash the subpoenas anyway.

[Defense Counsel]:  Understood.  Okay

On February 16, 2015, the State filed its factual stipulations.  Then, on September 17, 2015, the State re-filed its factual stipulations before trial began.  Neither of those documents was signed by Ross.  Before any testimony was taken at trial, the trial court asked about the factual stipulations and requested a copy.  However, the factual stipulations were not introduced into evidence, nor were they mentioned again.  Further, the trial court made no indication that the stipulations satisfied what Ross represented she wanted from the witnesses.  In addition, no order quashing the subpoenas appears in the clerk's record.  Neither Peterson nor Aiken were called as witnesses at the trial by either Ross or the State.

## B.    Analysis

The right of a defendant "to offer the testimony of witnesses, and to compel their attendance, if necessary," is guaranteed by the Sixth Amendment.  *Washington v. Texas*, 388 U.S. 14, 18–19 (1967).  Further, the Sixth Amendment guarantees the right to confront witnesses, including the right to cross-examine witnesses.  *Beham v. State*, 476 S.W.3d 724, 733 (Tex. App.— Texarkana 2015, no pet.) (citing U.S. CONST. amend. VI; *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996)).  Initially, we determine whether these rights were violated.  *See Washington*, 388 U.S. at 19.

44

A fair reading of the hearing on the motion to quash the subpoenas shows that the trial court made it clear to Ross that the subpoenas would remain active until the trial court signed an order quashing them. In addition, after the stipulations were filed, the trial court neither indicated that it thought the stipulations were satisfactory, nor entered an order quashing the subpoenas. Since no order quashing the subpoenas was signed, nothing prevented Ross from compelling the attendance of Peterson and Aiken and calling them as witnesses at trial. Thus, Ross has failed to show that her right to call these witnesses was denied. Further, since neither of these persons was called as a witness by the State, Ross has failed to show her right to confront and cross-examine them was denied. We overrule Ross' seventh point of error.

## VI.    Ineffective Assistance of Counsel Was Not Shown

In her sixth point of error, Ross contends that she was denied effective assistance of counsel because trial counsel failed to request a hearing to determine whether she was the victim of selective prosecution. In her eighth point of error, she contends that she was denied effective assistance of counsel because trial counsel failed to object to the State's stipulation of evidence and failed to make a bill of error regarding the proposed testimony of Peterson and Aiken.

Ross bases her sixth point of error on the equal protection clause of the Fourteenth Amendment. She argues that there were at least four people who participated in the search, and that all of them are identically situated. Nevertheless, she is the only one who was prosecuted for official oppression. Therefore, she reasons, she is a victim of selective prosecution. She faults trial counsel for failing to raise the issue at trial, and for failing to preserve the issue on appeal. In her eighth point of error, Ross faults trial counsel for failing to object to the State's factual

45

stipulation and for failing to make a record of the testimony of Peterson and Aiken.

### A.     Standard of Review

The Sixth Amendment to the United States Constitution guarantees an accused the right to effective assistance of counsel for his or her defense. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). If a conviction results from ineffective assistance of counsel, it denies the accused this valuable constitutional right. *See id.* at 687–88. The right to effective assistance of counsel does not mean, however, "errorless or perfect counsel whose competency of representation is to be judged by hindsight." *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

To prevail on her ineffective-assistance claim, Ross must prove by a preponderance of the evidence that (1) her counsel's performance was deficient, that is, that it fell below an objective standard of reasonableness and (2) it is reasonably probable that, except for her counsel's unprofessional errors, the outcome of the proceeding would have been different. *See Strickland*, 466 U.S. at 687–88, 694; *Ex parte Martinez*, 330 S.W.3d 891, 900–01 (Tex. Crim. App. 2011). For us to find that Ross' trial counsel was ineffective, the trial record must affirmatively demonstrate his deficiency. *Lopez v. State*, 343 S.W.3d 137, 142–43 (Tex. Crim. App. 2011). It is insufficient to show that her trial counsel's acts or omissions were merely questionable. *Id.* We presume that trial counsel had a sound trial strategy, and this presumption cannot be overcome unless there is evidence in the record of counsel's reasons for his conduct. *Martinez*, 330 S.W.3d at 901.

In determining whether the alleged deficiencies prejudiced Ross, we presume that the fact-finder acted in accordance with the law. *Strickland*, 466 U.S. at 694. In assessing prejudice, "we

46

look to the totality of the circumstances and evidence presented to determine if there is a reasonable probability that, but for Counsel's deficient performance, the result of the proceeding would have been different." *Martinez*, 330 S.W.3d at 903 (citing *Strickland*, 466 U.S. at 694). Failure to satisfy either prong of the *Strickland* test is fatal. *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006); *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005); *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003). Allegations of ineffectiveness "must 'be firmly founded in the record.'" *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). The *Strickland* test "of necessity requires a case-by-case examination of the evidence." *Williams v. Taylor*, 529 U.S. 362, 382 (2000) (quoting *Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring in judgment)).

### B. Analysis

In her sixth point of error, Ross asserts that she is a victim of selective prosecution in violation of her constitutional right to equal protection. To support a claim of selective prosecution, the defendant must make a prima facie showing

> [1] that [s]he has been singled out for prosecution while others similarly situated and committing the same acts have not . . . . [and (2)] that the government's discriminatory selection of [her] for prosecution has been invidious or in bad faith in that it rests upon such impermissible considerations as race, religion, or the desire to prevent [her] exercise of constitutional rights.

*United States v. Greene*, 697 F.2d 1229, 1234 (5th Cir. 1983) ; *see also United States v. Armstrong,* 517 U.S. 456, 464–65 (1996); *Gawlik v. State*, 608 S.W.2d 671, 673 (Tex. Crim. App. 1980); *Galvan v. State*, 988 S.W.2d 291, 296 (Tex. App.—Texarkana 1999, pet. ref'd). Prosecutions are

47

presumed to be proper, and therefore, "[a]n appellant claiming selective prosecution must provide 'exceptionally clear evidence' that the prosecution was initiated for an improper reason." *Galvan*, 988 S.W.2d at 296 (citing *County v. State,* 812 S.W.2d 303, 308 (Tex. Crim. App. 1989)).

In this case, there is no evidence in the record that the other three persons involved in the search have not been prosecuted, although the State does not dispute that assertion. Even if the record had shown that Ross was singled out for prosecution while others similarly situated were not, there is no evidence that the prosecution was initiated for impermissible considerations such as race, religion, or the desire to prevent Ross from exercising her constitutional rights.[22] Thus, the record does not show that Ross would have prevailed on a claim of selective prosecution if it had been asserted. Therefore, Ross has not shown that the outcome of her trial would have been different if trial counsel had asserted a claim of selective prosecution. *See Martinez*, 330 S.W.3d at 903. We overrule Ross' sixth point of error.

Ross' eighth point of error is based on her errant contention that the trial court quashed the subpoenas of Peterson and Aiken. She complains that trial counsel did not object to the offer of the State's factual stipulations into evidence and that he failed to make a bill of exceptions to the exclusion of the testimony of Peterson and Aiken. Even assuming that the stipulations were admitted into evidence, a review of the stipulations shows that they state essentially the same facts

---

[22]Ross cites several Texas and federal civil cases to support her argument that she need only show that she was treated differently without a reasonable basis. Those cases involved allegations of equal protection violations in a civil context. *See, e.g.*, *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000); *Price v. Tex. Alcoholic Beverage Comm'n*, No. 01-12-01164-CV, 2014 WL 3408696 (Tex. App.—Houston [1st Dist.] July 10, 2014, pet. denied) (mem. op.). However, those cases are not applicable in criminal prosecutions, where there is a presumption that a prosecutor has not violated equal protection and a hesitancy by the courts to examine the prosecutor's decision whether to prosecute, which includes a number of considerations that are not readily susceptible to a court's review. *See Armstrong*, 517 U.S. 456, 464–65.

that Ross' trial counsel represented to the trial court he sought from the testimony of Peterson and Aiken. The record does not reflect why trial counsel did not call Peterson and Aiken, but we presume he had valid strategic reasons not to call them. These reasons could include not wanting to risk that these witnesses might provide testimony more damaging to his client's case than any benefit he might gain from the evidence obtained in the State's stipulation. There is no evidence in the record to overcome this presumption. *See Martinez*, 330 S.W.3d at 901. Therefore, Ross has not shown that her trial counsel's performance was deficient. We overrule Ross' eighth point of error.

We affirm the judgment of the trial court.[23]

Ralph K. Burgess
Justice

Date Submitted:     September 28, 2016
Date Decided:       November 30, 2016

Publish

---

[23]This opinion involves a limited question, namely, whether there is sufficient evidence by which a reasonable fact-finder could find beyond a reasonable doubt that an agent of the Department, who was a state actor but not a peace officer, *see* TEX. CODE CRIM. PROC. ANN. art. 2.12 (West Supp. 2016) (defining "Who Are Peace Officers"), was (1) guilty of official oppression for (2) engaging in unlawful actions beyond the authority of the court's order. Accordingly, our opinion goes no further than simply finding sufficient evidence to support a reasonable fact-finder's conclusion, beyond a reasonable doubt, that appellant, who is not a peace officer, was guilty of official oppression as alleged in the indictment.