Richardson, J., delivered the opinion for a unanimous Court.
In 2011 Appellant, Rebekah Thonginh Ross, worked as an investigator for the Greenville office of the Texas Department of Family and Protective Services (hereinafter referred to as "the Department" or "CPS"). In 2015, she was convicted of the offense of official oppression.[1] The charge was based on an allegedly unlawful search that Ross conducted pursuant to her duties as a CPS investigator. Ross's conviction was affirmed by the Sixth Court of Appeals.[2] We granted Ross's petition for discretionary review to determine whether the court of appeals correctly held that the evidence was sufficient to support Ross's conviction.
Based upon our review of the record, viewing the evidence in the light most favorable to the verdict, we hold that the evidence was insufficient to support the trial court's finding beyond a reasonable doubt that Ross knew her conduct was unlawful, which is an essential element of *229 the offense of official oppression. We reverse the judgment of the court of appeals and render a judgment of acquittal.[3]
BACKGROUND FACTS
On December 12, 2011, the Department received a referral stating that a baby had just been born at a two bedroom, one bath, mobile home to a mother who was using drugs during her pregnancy. The report stated that the newborn had not received any medical attention, and the mother had a previous child who was removed due to the mother's drug use. Ross was assigned to the case on December 13, 2011.
After three days of searching databases and conducting research to locate the mother and baby, on December 15, 2011, Ross filed a Petition for Orders in Aid of Investigation of a Report of Child Abuse or Neglect and For Temporary Restraining Order. In her supporting affidavit, Ross reported what she had found through her investigation:
• The referral came to the Department on December 12, 2011, with very little information. Ross was assigned to the case on December 13, 2011. The newborn's parents were Leslie Avery Hunt Vargas (Hunt) and Nicholas Vargas (Vargas).
• Ross learned that the mother (Hunt) was recently in jail for warrants but had been released.
• The baby was born at a mobile home owned by the Vargas family located at 2321 Highway 69 S., Greenville, Texas.
• Ross and her supervisor, Natalie Ausbie Reynolds, went to the home on Highway 69 S. on or about December 13, 2011, and smelled ammonia coming from inside. All of the blinds on the windows were drawn. Ross knocked on the door and the blinds moved and someone appeared to look out.
• A Hispanic female and a white male opened the door. They stepped outside onto the porch but left the door slightly open. Ross observed an ammonia type smell coming from inside the home. Ross stated that, based on her training and experience, butane is an ingredient used in the manufacturing of methamphetamines and smells like ammonia.
• Ross asked the man and woman about the parents of the newborn baby. They stated that Hunt and Vargas had left just 5 minutes before Ross arrived. They confirmed that a baby had been born there and stated that they believed the baby was with Hunt and Vargas. The male explained that they were "just there to take a shower as their own water had been cut off." The man stated that Hunt and Vargas had a room in the home that was always locked and he assumed the baby stayed in that room. The man "stated that they will not cooperate with CPS or anyone else."
• A database search reflected that Hunt was arrested for DWI on December 8, 2011, two days before the birth. The jail stated there were charges from Rains County for possession of controlled substance and theft of property.
• A database search reflected that Hunt had two prior CPS cases. Her *230 first child tested positive for marijuana when born. That child was ultimately removed by CPS as a result of Hunt's chronic use of drugs and her attempted suicide. During that case Hunt continued to use cocaine and tested positive for it in urinalysis tests and oral swabs. She would disappear for 48 hours at a time multiple times a month and come back bruised and beat up.
• There were reports that the Vargas family were believed to use and manufacture drugs.
• Hunt used cocaine and attempted to commit suicide while caring for her first child. Hunt has an extensive history of drug use and was still using drugs at the close of her last CPS case which resulted in the child being placed with his father.
• Ross was told not to go back to the residence alone but to take Law Enforcement with her.
• Ross stated that there does not appear to have been any medical care for the newborn baby. The affidavit stated that "[t]he child may be at imminent risk of harm."
• Ross was told that Program Director Laura Ard had given permission for hair follicle tests to be performed on the mother, father, and child once they were located.
The district court issued an Order in Aid of Investigation on December 15, 2011. The Order was issued pursuant to Texas Family Code § 261.303(b), which provides that,
If admission to the home, school, or any place where the child may be cannot be obtained, then for good cause shown the court having family law jurisdiction shall order the parent ... to allow entrance for the interview, examination, and investigation.
The Order authorized a representative of the Department to enter the home at 2321 Highway 69 S. to examine the child and observe the premises. The Order listed several residences where the mother and child could be because Ross had done an extensive investigation to gather addresses of friends and family members. The Order provided as follows, in pertinent part:
2.2 The Court finds that there is good cause for the Department to have investigatory access to the child, UNKNOWN CHILD, and to enter the residence at 2321 Hwy 69 S., Greenville, TX [or other residences], where UNKNOWN CHILD is located, for an interview with and/or examination of UNKOWN [sic ] CHILD, and observation of the premises or immediate surroundings where UNKNOWN CHILD is located or where the alleged abuse or neglect occurred.
3.1 IT IS ORDERED that a representative of the Department is authorized to enter the residence at 2321 Hwy 69 S., Greenville, TX, [and seven other addresses] where UNKNOWN CHILD is located, for an interview with and/or examination of UNKNOWN CHILD, and observation of the premises or immediate surroundings where UNKNOWN CHILD is located or where the alleged abuse or neglect occurred in a manner consistent with the provisions of § 261.302, Texas Family Code with assistance from Law Enforcement if necessary.
3.2 IT IS ORDERED that Law Enform cent [sic ] accompany the Department to and inside the residence at 2321 Hwy 69 S., Greenville, TX, [and seven other residences], where UNKNOWN
*231 CHILD may be located by any means necessary.
The day after the order was issued, on December 16, 2011, Ross, two deputies, and another Department investigator, Jessica Francis, went back to the same mobile home on Highway 69 S. The deputies broke down the door because no one was home. In searching the bedroom, Ross and a deputy flipped over a mattress and discovered a large stain of blood and bodily fluid on its underside and on the box springs. There was also blood and bodily fluid that had sprayed onto the walls. In the bedroom they found a journal and a calendar indicating that the baby had been born at the home. There was nothing else to indicate whether the child was still alive or whether the child had died.
In the kitchen, Ross instructed a deputy to get a crock pot down from a shelf and look inside. Ross and the deputies also opened kitchen cabinets and drawers. Nothing more was found. Later that day the deputies and Department investigators located Hunt and the baby at a different residence.
After the search at the Highway 69 S. home, Francis reported to Ross's supervisor, Natalie Ausie Reynolds, and to her own supervisor, Rochell Bryant, that she did not believe Ross followed Department policies in conducting the search of the kitchen. Based on this complaint, Ross was eventually charged with the criminal offense of official oppression.[4]
Ross's indictment alleged that, on or about December 16, 2011, Ross, acting individually or as a party with Natalie Ausbie Reynolds,[5] intentionally subjected complainant, Leslie Hunt, to search and/or seizure that Ross knew was unlawful, and Ross was acting under color of her employment as a public servant, namely a CPS investigator for the Texas Department of Family and Protective Services, at the time of the offense.
Ross's bench trial began on September 17, 2015. The State presented six witnesses, rested, and then the defense rested without presenting any witnesses. The State's first witness was Jessica Francis. She testified to the following facts:
• Generally speaking, the Department's investigators receive intakes of allegations regarding abuse or neglect, and they conduct interviews and gather information to investigate those allegations and determine if there is any intervention necessary to protect the children involved. Francis went with Ross to the Highway 69 S. home to assist her in this investigation.
• After the two members of the Hunt County Sheriff's Office broke down the door and made sure nobody was in the home, Ross entered the home. Francis stayed outside for "several minutes," then went into the home.
• She went into the bedroom where Ross and one of the deputies were searching. They had flipped the mattress (which had a bodily fluid and blood stains on it), and had been looking at a journal and a calendar. Francis said that she felt like the things they were looking at in the *232 bedroom were helping them in their search for the child.
• Then they went into the kitchen, and Ross "instructed the officer that was helping us to grab a crock pot or a pot down from-it was either up on a shelf or up on the fridge, to look in that."
• Francis testified that she did not feel that the search of the kitchen was authorized by the Order because they were "no longer looking for the baby."
• Francis felt it necessary to report that to Reynolds, Ross's supervisor, and to Rochell Bryant, Francis's supervisor.
On cross-examination, Ross's attorney questioned Francis about whether the significant amount of blood that they found on the mattress and in the bedroom could have been there because the baby had died. He also suggested the possibility that if the baby had died it could have been hidden somewhere in the kitchen, such as in the crock pot. Francis was not agreeable to these suggestions. Francis believed that Ross was concerned about gathering information about Hunt's drug use. Francis also took issue with the fact that, once they found the baby later that day at another residence, Ross wanted to get the baby drug tested before the baby was seen by a doctor. It was established that there were in fact drugs in the baby's system. Francis believed, however, that the baby needed to see a doctor first.
The next witness was Sandra Balderas, the Region 3 Training Academy Manager for the Department of Family and Protective Services. Balderas testified to the following:
• She has been employed at the Academy since 2008, and she has been the Manager since 2012.
• The Academy Manager "schedules trainings, insures the fidelity of the training, and that the trainers are training the correct formats provided from the State office, and anything else that comes up regarding training."
• Balderas said that the Academy provides training to employees and potential investigators on Fourth Amendment, civil rights, and search and seizure.
• All of the new hires take a computer based training labeled "4th Amendment Training." They attend a class taught by an attorney that only covers the Fourth Amendment. In addition, the legal aspects of the Fourth Amendment are worked into all of the training classes on how to investigate.
• Balderas said that, according to Ross's transcript, she completed Basic Skills Development, which includes some Fourth Amendment training. She also completed, on July 10, 2008, a computer based training entitled "CPS and the 4th Amendment, Respecting the Rights of Families." Ross also completed "Basic Skills Development for CPS Investigators," which was a specialized investigation block of training that included the Fourth Amendment and she completed "CPS, the 4th Amendment, Respecting the Rights of Families" again on November 4, 2008.
• Balderas also testified that, in order to reenforce what the investigators have learned in training, the Academy will do activities such as simulations and role-playing.
The State's third witness was Kenny Stillwagoner, another investigator with the Department. He was also a police officer. He testified that in the context of other *233 investigations Ross would ask him to search for drugs in homes, and he would refuse because it was not their job. On cross examination, Ross's defense counsel focused on just this case, and questioned Stillwagoner about how unusual this particular case was-a report came into CPS that a baby had been born in a mobile home without any medical care; there was a complaint that the baby's mother had a previous drug history and that the baby had been exposed and was probably addicted to narcotics; nobody knew where this baby was and whether the baby was alive or dead; and there was a court order for law enforcement to assist in searching the home. Stillwagoner had to admit that it was "fair" to call this a "rare" case.
The State's fourth witness was Leslie Hunt Vargas, the baby's mother. She testified that on December 16, 2011, she and her husband had left the Highway 69 S. home, and they were not going to go back there to live. The home was a mobile home that was owned by a family member of Hunt's husband. They were just staying there temporarily. When they found out that the Department was looking for them and for the baby, they decided to leave the home to avoid encountering investigators with the Department. But Hunt did not find out until after they had left the home that the Department had forcibly entered the home and searched it. She also admitted that she figured that was something "they legally could do." Hunt also agreed that the amount of blood and bodily fluid on the mattress and in the bedroom made it look "like somebody tried to kill somebody."
The State's fifth witness was Rochell Bryant, an investigative supervisor at the same Department. Investigative supervisors "guide [the investigators] through what needs to be done on a task, make supervisor decisions, give guidance on cases, help caseworkers out, make sure that procedures are being followed." Bryant testified that after Francis expressed her concerns regarding how Ross conducted the search of the Highway 69 S. home, she reported it directly to her supervisor, Laura Ard, the program director. Bryant expressed her opinion that, based on her experience and training, it is "never" proper to search through cabinets, search through kitchen drawers and other things like that in a kitchen. She testified that she would "never" go into an empty home, even with a court order.
The trial judge found Ross guilty and sentenced her to a year in the Hunt County Jail, 150 hours of community service, and a $2,000 fine. The sentence was suspended, Ross was placed on community supervision for two years, and she was ordered to serve a 30-day jail sanction as a condition of probation.
On direct appeal Ross brought several points of error. Her first five points assert that the evidence is legally insufficient to support a finding that she intentionally subjected Hunt to a search that she knew was unlawful.[6] The court of appeals held that the evidence was sufficient to support the judgment of official oppression because the district court's Order in Aid of Investigation did not authorize the search of the kitchen.[7] The court of appeals concluded that, once Ross entered the home and determined that the child was not there, the search of the kitchen was outside the scope of what was authorized by the court order, making the search "unlawful."[8] After *234 addressing Ross's other points of error, the court of appeals upheld her conviction for official oppression.[9] We granted review to address whether the court of appeals erred by holding that the evidence was legally sufficient to prove that Ross knew her search was unlawful.
ANALYSIS
Texas Penal Code § 39.03 defines the offense of official oppression as follows, in pertinent part:
(a) A public servant acting under color of [her] office or employment commits an offense if [she]
(1) intentionally subjects another to ... search [or] seizure ... that [she] knows is unlawful; ...."[10]
Thus, the essential elements of the crime of official oppression, as charged against Ross, are as follows:
(1) Ross, while acting under color of her employment with the Texas Department of Family Protective Services as an investigator,
(2) intentionally,
(3) subjected the complainant, Hunt,
(4) to a search and/or seizure,
(5) that Ross knew was unlawful.
The term "unlawful" is defined in Texas Penal Code § 1.07 :
(a) In this code: ... (48) "[u]nlawful" means criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege."[11]
According to the plain language of this statute, this definition applies to the term "unlawful" as it is used in section 39.03(a)(1).
When reviewing a legal sufficiency challenge, we view all of the evidence in the light most favorable to the verdict[12] to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[13] The key question in this case is whether the evidence presented supports the conclusion that Ross committed every essential element of the crime of official oppression.[14] Although Ross raises several arguments to support her petition, we will focus on the argument that the State's evidence was insufficient to prove beyond a reasonable doubt that Ross knew her conduct was unlawful.
To support the allegation that Ross knew her conduct was unlawful the State presented the following evidence: (1) testimony *235 and exhibits reflecting the training Ross received regarding the Fourth Amendment, (2) the journal and calendar found in the bedroom indicating that the baby had been born in there, and (3) testimony by Francis that Ross stated that she was searching the kitchen to find evidence of drug use. Under these facts, we hold that this evidence was insufficient to prove beyond a reasonable doubt that Ross knew that her conduct was unlawful.
The court order obtained by Ross allowed her to enlist the help of law enforcement to enter the home and locate the child "by any means necessary." It allowed her to search "the premises" to locate the newborn child and observe "where the alleged abuse or neglect occurred." When Ross and the officers entered the home and went into the bedroom, they discovered a mattress soaked with blood and bodily fluid. There was blood sprayed all over the walls. Even Hunt admitted at trial that the room had so much blood, it looked "like somebody tried to kill somebody." The witnesses who testified that, based on their training, they would not have searched the kitchen area and cabinets, also admitted that they had not had a case like this one and that this was not a typical case. The training materials on the Fourth Amendment that were admitted during the trial did not address this type of fact situation. Even if the materials had addressed this situation, that information would not have been sufficient to demonstrate beyond a reasonable doubt that Ross knew that her conduct was unlawful.[15]
Given the amount of blood on the mattress and walls, the condition of the home, the information Ross had regarding the history of drug use, the lack of medical care to the child who was evidently just recently born in the home, the prior criminal and CPS history surrounding Hunt, and given the fact that there was no indication where the baby might be and whether the baby was alive or dead, it is possible that abuse and neglect took place throughout the entire home. Under these facts, we hold that no rational trier of fact could find the essential elements of the offense of official oppression beyond a reasonable doubt,[16] because the State presented insufficient evidence that Ross knew, under these circumstances, that her conduct was unlawful. We reverse the judgment of the court of appeals against Ross and render a judgment of acquittal.

Tex. Penal Code § 39.03(a)(1) (providing that "[a] public servant acting under color of [her] office or employment commits an offense if [she] ... intentionally subjects another to ... search [or] seizure ... that [she] knows is unlawful ....").

Ross v. State , 507 S.W.3d 881, 894 (Tex. App.-Texarkana 2016).

See Winfrey v. State , 323 S.W.3d 875, 885 (Tex. Crim. App. 2010) (citing Burks v. United States , 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) ) (acquitting the defendant after finding the evidence was insufficient by itself to support a finding of guilt beyond a reasonable doubt).

Tex. Penal Code § 39.03(a)(1).

Although Reynolds is listed as a party in the Ross indictment, Reynolds was not indicted for the offense of official oppression arising out of the search of the Vargas's mobile home. At the February 9, 2015, pretrial hearing in Ross's case, it was suggested that Reynolds be removed from the language of the indictment. There were no objections to removing Reynolds's name from Ross's indictment, but there is no indication that Reynolds's name was actually stricken from the Ross indictment.

Ross , 507 S.W.3d at 894.

Id. at 902.

Id. at 903. Because the court of appeals decided that the search was outside the scope of the court order, it also addressed whether an emergency justified the search of the kitchen. However, in light of our decision today, we need not address the issues of exigency or emergency.

Id. at 914.

Tex. Penal Code § 39.03(a)(1).

Tex. Penal Code § 1.07(a)(48).

Merritt v. State , 368 S.W.3d 516, 525 (Tex. Crim. App. 2012) ; see also Blea v. State , 483 S.W.3d 29, 33 (Tex. Crim. App. 2016) (citing Dobbs v. State , 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) ).

Laster v. State , 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting Jackson v Virginia , 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original) ); see also Brooks v. State , 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) ("[T]he Jackson v. Virginia standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.").

Laster v. State , 275 S.W.3d at 517 ; Winfrey , 323 S.W.3d at 882 (noting that, "It is the obligation and responsibility of appellate courts 'to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged.' " (citing Williams v. State , 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) ) ).

Ross argued that her conduct was neither "criminal" nor "tortious," and that, in the alternative, she had a defense "amounting to justification" because she had a court order to search the house. See Tex. Penal Code § 9.21 ("Public Duty").

Laster , 275 S.W.3d at 517.