Richardson, J., delivered the opinion for a unanimous Court.
In 2012 Appellant, Natalie Ausbie Reynolds, worked as an investigative supervisor for the Greenville office of the Texas Department of Family and Protective Services (hereinafter referred to as "the Department" or "CPS"). In 2015, she was convicted of the offense of official oppression.[1] The charge was based on an allegedly unlawful search and/or seizure of a cell phone belonging to a fifteen-year-old girl who was in lawful emergency custody of the Department. Reynolds's conviction was affirmed by the Sixth Court of Appeals.[2] We granted Reynolds's petition for discretionary review to determine whether the court of appeals correctly held that the evidence was sufficient to support Reynolds's conviction.
Based upon our review of the record, viewing the evidence in the light most favorable to the verdict, we hold that the evidence was insufficient to support the trial court's finding that Reynolds knew her conduct was unlawful, which is an essential element of the offense of official oppression. We reverse the judgment of the court of appeals and render a judgment of acquittal.[3]
*237 BACKGROUND FACTS
On June 13, 2012, the Department received a referral regarding a fifteen-year-old girl, A.K., who had run away from her guardian, Brenda Robertson. Robertson had called the Department seeking assistance. Robertson told them that A.K. had run away from Robertson; that A.K. was using and dealing methamphetamines and marijuana (Robertson had found scales, baggies, and drug paraphernalia); that A.K. had lost a significant amount of weight; that A.K. had been gone for two weeks; and that Robertson did not know her whereabouts. Attempts to contact A.K.'s mother, Hollie King, were unsuccessful. Moreover, A.K.'s father was incarcerated for various offenses. Prior to living with Robertson, A.K. lived with Rene Cain, who also informed Reynolds that she could not control A.K. and could not continue to care for A.K. due to A.K.'s attitude.
A.K. was found by a Deputy with the Hunt County Sheriff's Department at the home of Michael Watts, an unrelated 23-year-old male. A.K. was transported to the Hunt County Juvenile Detention Center, where her personal belongings-a ring, a bracelet, and her cell phone-were confiscated. The next day, June 14, 2012, A.K. was released into the custody of the Department because A.K. did not have an appropriate or willing caregiver, and because it was determined that if she were released from the Detention Center she would run away again. The case was assigned to Rebekah Thonginh Ross, who was an investigator with the Department and supervised by Reynolds.
When A.K. arrived at the Department with Ross and Reynolds, A.K. made it very clear that she refused to go to a placement home in Dallas or any other "shelter." While in the Department's custody, A.K.'s ring and bracelet were returned to her, but she was not given her cell phone. A.K. demanded the return of her cell phone, and an argument ensued between A.K., Reynolds, and Ross. A.K. was upset and refused to cooperate because they would not return her cell phone to her. The cell phone was eventually locked in a cabinet for the night, and two Department employees drove A.K. to a placement facility. That facility did not allow the children to have cell phones.
The following day, June 15, 2012, the Department filed a petition for temporary custody of A.K. Attached to and in support of the petition was an affidavit executed by Reynolds which included the following statements, among others:
• A.K.'s mother, Hollie King, is currently living in a hotel. A.K.'s father is currently in prison.
• Robertson (A.K.'s guardian) gave A.K. a urinalysis before she ran away and A.K. tested positive for methamphetamines, amphetamines, marijuana, and Tricyclic. Robertson found scales, baggies, and drug paraphernalia among A.K.'s things.
• A.K. had previously run away from Robertson's house.
• Robertson wants A.K. to get help and receive treatment for methamphetamine addiction. Robertson stated she did not think A.K. would stay at her home and that A.K. needed a secure facility or she would likely run away again.
• Robertson stated that she had found out that A.K. was dating a 30-year-old man, Steven Lamb, and was associating with 23-year-old Michael Watts.
*238 • A.K.'s mother, Hollie King, left A.K. with Robertson in 2011 because she no longer wanted to care for A.K. King has a criminal background and a history of drug abuse.
• Robertson stated that she did not know of any relatives who were willing to care for A.K.
• While at the juvenile detention center A.K. tested positive for methamphetamines, amphetamines, and marijuana.
• When A.K. arrived at the Department office, she was upset and confrontational with the staff.
• A.K. denied selling drugs and stated she only used the scales found by Robertson to weigh her own purchases. She refused to provide information as to who provided her with drugs or how she obtained them.
• King confirmed that she could not care for A.K.
By court order dated that same day, June 15, 2012, the Department was awarded temporary custody of A.K. The Order contains the following relevant findings:
• All reasonable efforts, consistent with time and circumstances, have been made by CPS to prevent or eliminate the need for removal of A.K. the subject of this suit, from the home and to make it possible for A.K. to return home, but continuation in the home would be contrary to A.K.'s welfare.
• There is a continuing danger to the physical health or safety of A.K. if A.K. is returned to the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian who is presently entitled to possession of A.K.
• Continuation of A.K. in the home would be contrary to A.K.'s welfare.
• Reasonable efforts consistent with the circumstances and providing for the safety of A.K. were made to prevent or eliminate the need for removal of A.K.
More than a full year later, Reynolds was charged with the criminal offense of official oppression based on her allegedly seizing and searching A.K.'s cell phone. The indictment alleged that, on or about June 14, 2012, Reynolds, acting individually or as a party with Rebekah Thonginh Ross,[4] intentionally subjected the complainant, A.K., to a search and/or a seizure that Reynolds knew was unlawful, and Reynolds was acting under color of her employment as a public servant, namely, a CPS investigator for the Texas Department of Family Protective Services, at the time of the offense.
On October 20, 2015, a one-day bench trial was conducted. The State presented four witnesses, then it rested, and then the defense rested without calling any witnesses. The State's first witness was Sandra Balderas, the Region 3 Training Academy Manager for the Department of Family and Protective Services. Balderas testified as follows, in pertinent part:
• She has been the Training Academy Manager since 2012. Before that she worked as a trainer in the same office, and before that she was a caseworker for the Department.
• She was there to testify as to how the Department employees are instructed regarding Fourth Amendment privacy rights of the Department's *239 clients. Balderas said that the Department employs an attorney to teach Department employees.
• Balderas said that she has reviewed Reynolds's training records. Reynolds's training began in 2005. Specifically, the Fourth Amendment training was completed by Reynolds on November 4, 2008. She would have attended the classes taught by the Department's attorney employed to teach that subject.
• According to Balderas, "you couldn't get through the Academy without knowing and being very much aware of what the 4th Amendment is because it's incorporated in how you conduct an investigation."
The State's second witness was Edie Fletcher. She currently works for the City of Dallas Parks and Recreation Department, but she used to work as an investigator for the Department in Hunt County. Fletcher's direct supervisor was Rochell Bryant. Fletcher testified to the following facts:
• On the day that A.K. was released into the custody of the Department, Fletcher was there doing a family team meeting, and she could hear a lot of crying and voice-raising in the hallway right outside of the conference room. She recognized two of the voices as Reynolds's and Ross's.
• After she finished her meeting, Fletcher was heading back to her office and ran into Ross and A.K. Ross asked Fletcher if she would take A.K. to her placement that evening.
• Fletcher asked Ross about the commotion, and learned that it was because A.K. wanted her cell phone back.
• Fletcher went to Ross's office and asked her for A.K.'s phone.
• Fletcher said she saw Ross with the cell phone in her hand and "she was messing with it." She asked Ross for the phone, and Ross would not give it to her because "she was looking for some evidence."
• Fletcher went back to her office and called Reynolds, who was Ross's supervisor, but she had left for the day. Fletcher explained to Reynolds that A.K. was very upset and uncooperative about the transport to her placement. Fletcher said that Reynolds told her that they needed the phone to go through it to find drug evidence.
• Fletcher said that she asked Reynolds if she could "just get the phone and then lock it ... in [her] filing cabinet for the evening and give it to [Reynolds] in the morning." She said Reynolds agreed to that.
• The next morning Fletcher gave Reynolds A.K.'s cell phone. Reynolds said she was going to take it back in her office and finish her investigation.
• Fletcher admitted that she took A.K. to her temporary placement that evening, a group home, and that their policy was that cell phones were not allowed. She agreed that "the phone was going to be in CPS custody no matter what because the temporary placement facility was not going to permit [A.K.] to have a phone."
The next witness to testify was Kenny Stillwagoner. He testified that he thought Reynolds believed there were drug dealers's numbers in the phone and that's why she needed it. He confirmed that A.K. had not given Reynolds and Ross permission to go through the phone.
The State's last witness to testify was A.K. She was 19 at the time of trial and had just recently been placed on felony probation for possession of a controlled *240 substance. She testified that when she was brought into the Department she was a 15 year-old runaway. She was first booked into the Juvenile Detention Center, and she had to give them her phone, a ring, and a bracelet. Then the next day she was released into the custody of the Department. By her own admission, A.K. had no intention of cooperating with the Department, and she did not want to be there. She insisted that she "wasn't going" to a shelter. A.K. said that the CPS workers took her phone and were going through it and wouldn't give it back to her. They returned her ring and bracelet, but they would not return her cell phone. A.K. admitted that she "threw a big ol' fit about" wanting her phone back:
A. I kept them all there until after-after hours. I wasn't going nowhere, I wasn't going to no shelter. I caused a big ol' scene. I told them to call the police back up there because I'm not going nowhere without my phone and this big ordeal.
A.K's phone was not password-protected when Reynolds and Ross took it. She confirmed that no one from the Department asked for permission to use her phone, and she did not give permission. On cross-examination, A.K. admitted that she did not see Reynolds ever in possession of her phone. "Well, I didn't see anyone go through it." A.K. also admitted that she "wasn't being kind at all," and that the argument about her phone went on for "several hours." A.K. said that she was "pretty angry." She said that Reynolds and Ross were asking her about the older men that A.K. was staying with. The argument lasted until the phone was locked up: "the supervisor got it from her and it was with her and then before I would do anything, I had them get it and they put it in this file cabinet and locked it up and then that was the end of it."
After closing arguments the trial judge found Reynolds guilty of official oppression. She was sentenced to one year in the Hunt County Jail, 150 hours of community service, and a $2,000 fine. The court suspended her sentence and placed her on community supervision for two years with a 30 day jail sanction as a condition of probation.
On direct appeal, Reynolds challenged the legal sufficiency of the evidence to support her conviction. The court of appeals held that the evidence was legally sufficient to support the verdict that Reynolds, either as a primary actor or as a party with Ross, intentionally seized and searched A.K.'s cell phone; that her actions were tortious; and that Reynolds knew her actions were tortious.[5] We granted review to address whether the court of appeals erred by holding that the evidence was legally sufficient to support Reynolds's conviction for official oppression.
ANALYSIS
Texas Penal Code § 39.03 defines the offense of official oppression as follows, in pertinent part:
(a) A public servant acting under color of [her] office or employment commits an offense if [she]
(1) intentionally subjects another to ... search [or] seizure ... that [she] knows is unlawful; ...."[6]
Thus, the essential elements of the crime of official oppression, as charged against Reynolds, are as follows:
(1) Reynolds, while acting under color of her employment with the Texas *241 Department of Family Protective Services as an investigative supervisor,
(2) intentionally,
(3) subjected the complainant, A.K.,
(4) to a search and/or seizure,
(5) that Reynolds knew was unlawful.
The term "unlawful" is defined in Texas Penal Code § 1.07 :
(a) In this code: ... (48) "[u]nlawful" means criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege."[7]
According to the plain language of the statute, this definition applies to the term "unlawful" as it is used in section 39.03(a)(1).
When reviewing a legal sufficiency challenge, we view all of the evidence in the light most favorable to the verdict[8] to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[9] The key question in this case is whether the State met its burden to prove beyond a reasonable doubt that Reynolds committed every essential element of the crime of official oppression.[10] Although Reynolds raises several arguments to support her petition, we will focus on the argument that the State's evidence was insufficient to prove beyond a reasonable doubt that Reynolds knew her conduct was unlawful.
To support the allegation that Reynolds knew her conduct was unlawful, the State presented witness testimony regarding the training Reynolds would have had on how to conduct an investigation under the Fourth Amendment. The State also presented evidence that A.K. had not given anyone at the Department permission to seize or search her cell phone.
Reynolds argues in response that the Fourth Amendment training did not cover this particular fact situation and that, because the Department had emergency custody of A.K., under the totality of circumstances, it was not unreasonable for Reynolds to believe that the Department had the authority to confiscate A.K.'s cell phone despite A.K.'s protests.
Texas Family Code § 262.104 allows the Department, under certain circumstances, to take emergency possession of a child without a court order. Section 262.104 states as follows, in pertinent part:
(a) If there is no time to obtain a temporary order, temporary restraining order, or attachment under section 262.102(a) before taking possession of a child consistent with the health and safety of that child, an authorized representative *242 of the Department of Family and Protective Services, a law enforcement officer, or a juvenile probation officer may take possession of a child without a court order under the following conditions, only.
(1) on personal knowledge of facts that would lead a person of ordinary prudence and caution to believe that there is an immediate danger to the physical health or safety of the child.
* * *
(b) An authorized representative of the Department of Family and Protective Services, a law enforcement officer, or a juvenile probation officer may take possession of a child under subsection (a) on personal knowledge or information furnished by another, that has been corroborated by personal knowledge, that would lead a person of ordinary prudence and caution to believe that the parent or person who has possession of the child has permitted the child to remain on premises used for the manufacture of methamphetamine.[11]
The time frame for emergency possession is limited-a petition for a court order must be filed without "unnecessary delay" and a hearing held "no later than the first working day after the date the child is taken into possession."[12] Reynolds followed that procedure in this case by timely obtaining a court order appointing the Department as managing conservator of A.K. There is no case law addressing, nor statutory provision specifying, the Department's rights and duties during the brief window of time that the child is in the Department's emergency possession.[13]
The State argues that because A.K.'s cell phone was seized and allegedly searched on June 14, 2012, before the Department was awarded managing conservatorship, she did not have authority to confiscate and search the cell phone. However, we need not decide whether Reynolds had the authority to confiscate and search the cell phone. We only need to decide whether the State met its burden to prove beyond a reasonable doubt that Reynolds knew that her conduct was unlawful. For the reasons discussed herein, we hold that there was insufficient evidence to prove that Reynolds knew her conduct was unlawful. It was not unreasonable for Reynolds to believe that she, or anyone in the Department acting for her, had the authority to confiscate A.K.'s cell phone so that A.K. could not use it to engage in self-destructive behavior, such as running away again, contacting adult males, and obtaining and/or selling drugs. Certainly, A.K.'s continued connection to the world she inhabited as a runaway was detrimental to the Department's goal of obtaining a stable environment, drug treatment, and rehabilitation for A.K., if needed.[14] Moreover, A.K. was not going to be *243 permitted to take possession of her cell phone in any event, since that evening the Department was placing her with a facility that did not allow the children to possess cell phones.
The court of appeals noted that Reynolds's motives in taking the cell phone were not based on a desire to find placement for A.K. but were instead related to A.K.'s drug use.[15] According to the court of appeals, although it was reasonable for the Department to take possession of A.K. for the purpose of finding a safe place for her to reside, it was impermissible for Reynolds to confiscate A.K.'s cell phone to look for evidence of drug activity.[16] However, regardless of whether Reynolds had a subjective intent to seek out information regarding A.K.'s drug use, the State still presented insufficient evidence that Reynolds knew that what she was doing was unlawful. We hold that, even in the light most favorable to the verdict of guilt, the evidence was insufficient to support Reynolds's conviction for official oppression because the State did not prove beyond a reasonable doubt that Reynolds knew her conduct was unlawful. We reverse the judgment of the court of appeals against Reynolds and render a judgment of acquittal.

Tex. Penal Code § 39.03(a)(1) (providing that "[a] public servant acting under color of [her] office or employment commits an offense if [she] ... intentionally subjects another to ... search [or] seizure ... that [she] knows is unlawful ....").

Reynolds v. State , 507 S.W.3d 805, 808 (Tex. App.-Texarkana 2016).

See Winfrey v. State , 323 S.W.3d 875, 885 (Tex. Crim. App. 2010) (citing Burks v. United States , 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) ) (acquitting the defendant after finding the evidence was insufficient by itself to support a finding of guilt beyond a reasonable doubt).

Although Ross is mentioned by name as a party to the offense in Reynolds's indictment, there is no indication that Ross was also charged with official oppression based on the search and seizure of A.K.'s cell phone.

Reynolds , 507 S.W.3d at 808.

Tex. Penal Code § 39.03(a)(1).

Tex. Penal Code § 1.07(a)(48).

Merritt v. State , 368 S.W.3d 516, 525 (Tex. Crim. App. 2012) ; see also Blea v. State , 483 S.W.3d 29, 33 (Tex. Crim. App. 2016) (citing Dobbs v. State , 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) ).

Laster v. State , 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting Jackson v. Virginia , 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original) ); see also Brooks v. State , 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) ("[T]he Jackson v. Virginia standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.").

Laster , 275 S.W.3d at 517 ; Winfrey , 323 S.W.3d at 882 (noting that, "It is the obligation and responsibility of appellate courts 'to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged.' " (citing Williams v. State , 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) ) ).

Tex. Fam. Code § 262.104 ("Taking Possession of a Child in Emergency Without a Court Order").

Tex. Fam. Code § 262.105.

Furthermore, this incident occurred in 2012, two years before the United States Supreme Court decided that a warrant was required to search a cell phone seized incident to an arrest, Riley v. California , --- U.S. ----, 134 S.Ct. 2473, 2495, 189 L.Ed.2d 430 (2014), and two years before this Court held that "a citizen does not lose his reasonable expectation of privacy in the contents of his cell phone merely because that cell phone is being stored in a jail property room." State v. Granville , 423 S.W.3d 399, 417 (Tex. Crim. App. 2014).

See Riley v. California , --- U.S. ----, 134 S.Ct. 2473, 2489, 189 L.Ed.2d 430 (2014) ("[T]he term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.").

Reynolds , 507 S.W.3d at 813 n.8.

Reynolds , 507 S.W.3d at 813.