

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0983-19

**JUAN ANTONIO GONZALEZ, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
FROM THE EIGHTH COURT OF APPEALS
EL PASO COUNTY**

**WALKER, J., filed a dissenting opinion in which SLAUGHTER, J., joined.**

## DISSENTING OPINION

This case comes back before our Court after we remanded to the court of appeals. *Gonzalez v. State*, 544 S.W.3d 363, 375 (Tex. Crim. App. 2018). On remand, the court of appeals overruled Appellant's issues which claimed that the evidence is legally insufficient to support his conviction for murder. Appellant petitions this Court for discretionary review. Because I agree with Appellant and the dissenting Justice at the court of appeals that the evidence is legally insufficient, I would grant review. Because the Court does not, I respectfully dissent.

### I — Background

The basic facts of this case are, essentially,[1] that Juan Antonio Gonzalez, Appellant (age 17 at the time), and his two friends, Alan Medrano (age 19) and Juan Gomez (age 18), were walking home from school in the late afternoon along a sidewalk on the side of a busy residential street. As they were walking, Gomez "keyed" several parked cars, including the car of Jonathan Molina, a police officer who was off-duty at the time. Molina, who was not in uniform, emerged angrily from his house and confronted Gomez. Although there is some dispute as to how angry and confrontational Molina was and which particular words he said to Appellant, Medrano, and Gomez, an argument quickly ensued and escalated. Molina shoved Appellant, and Appellant reacted by punching Molina. Then, Appellant tackled Molina by using a "judo move" to take down Molina by picking him up by the legs and dropping him. This caused Molina's head to hit the concrete sidewalk, and Molina, who weighed 275 pounds, likely did not break his fall in any way. Appellant got on top of Molina and punched him two or three times in the face. Then Appellant, Medrano, and Gomez walked away from the scene, and they began running when they heard a bystander say the police were being called.

The evidence showed that Molina's head hit the concrete in an area where the surface was irregular and jutted up "like a teepee." Molina suffered a brain injury and died ten days later. According to the medical examiner, Appellant's punches had nothing to do with the cause of death. The blow to Molina's head from hitting the sidewalk was not a survivable injury.

After the fight, Appellant went to an uncle's apartment and began sending and receiving messages on Facebook, including messages related to the fight. In messages to his girlfriend,

---

[1] The facts of this case were thoroughly recited in our previous opinion. *See Gonzalez*, 544 S.W.3d at 365–69.

Appellant told her that he might go to jail because he and "two friends walked home and this guy starting talking shit to us, and at first I told him to back off and he pushed me so I punched him, then tackled him, then punched him again." Appellant also said that "It's not my fault tho he was like 30 and twice my size, . . . I'm really really really scared" and "I shouldn't have hit him, I don't know what I was thinking." He told his girlfriend that they ran when they saw the man twitching and bleeding. After hearing a news report that Molina had died, Appellant messaged Medrano that, "I hope u didn't get caught I killed the guy, he went into compulsions and died." When later accounts reported that Molina was alive, Appellant messaged, "Dude turn on the news there's all this crap going on." Appellant claimed he was going to turn himself in the next day, but police located and arrested him at 3:00 a.m.

At trial, Medrano testified that he and Appellant routinely taught each other and practiced boxing and judo moves. He testified that Appellant taught him how to take down someone bigger by grabbing their legs and dropping them, causing the person to fall on their own weight, allowing the person who executed the move to climb on top of the downed individual. Medrano said he and Appellant would wrestle and practice moves while hanging out at home.

Appellant was charged with capital murder, but the jury convicted him of the lesser offense of murder. After we remanded this case back to the court of appeals,[2] that court considered, among other issues, Appellant's challenge that the evidence was legally insufficient to support the murder conviction. The court of appeals disagreed and found that there was legally sufficient evidence to

---

[2] *Id.* at 375.

show that Appellant either intended to cause Molina's death,[3] or, while intending to cause serious bodily injury to Molina, committed an act clearly dangerous to human life that caused Molina's death.[4] *Gonzalez v. State*, No. 08-14-00293-CR, 2019 WL 1553583 at *5–9 (Tex. App.—El Paso Apr. 10, 2019) (not designated for publication). Justice Rodriguez dissented. *Gonzalez*, 2019 WL 1553583 at *21 (Rodriguez, J., dissenting). She agreed with Appellant that the evidence was insufficient to show murder. *Id.* Instead, she thought the evidence was sufficient to support manslaughter, and she would have reformed the judgment to reflect a manslaughter conviction and remanded for a new punishment hearing. *Id.*

## II — Sufficiency of the Evidence

In assessing the sufficiency of the evidence to support a criminal conviction, reviewing courts "consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 243–44 (Tex. Crim. App. 2019) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (quoting *Jackson*, 443 U.S. at 319). Each fact need not

---

[3] *See* TEX. PENAL CODE Ann. § 19.02(b)(1) ("A person commits an offense if he . . . intentionally or knowingly causes the death of an individual").

[4] *See id.* § 19.02(b)(2) ("A person commits an offense if he . . . intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual").

point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (citing *Hooper*, 214 S.W.3d at 13). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Id.*

An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence. *Id.*; *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). Instead, the appellate court's role is restricted to guarding against the rare occurrence when the factfinder does not act rationally. *Nisbett*, 552 S.W.3d at 262; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). This rationality requirement is a key, explicit component of the *Jackson* sufficiency standard. *See Jackson*, 443 U.S. at 319 ("[T]he relevant question is whether, *after viewing* the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis added).

Thus, a reviewing court is not to simply determine whether there is evidence that supports the verdict, and, if so, declare that the evidence is legally sufficient. "[T]he *Jackson v. Virginia* standard is not a 'no evidence' standard." *Johnson v. State*, 23 S.W.3d 1, 15 (Tex. Crim. App. 2000) (McCormick, P.J., dissenting). The *Jackson* standard "requires the reviewing court to consider *all* the evidence in the 'light most favorable to the verdict,' and then it requires the reviewing court to decide whether the jury's finding is 'rational.'" *Id.* (emphasis in original).[5]

---

[5] "[*A*]*ll of the evidence* is to be considered." *Jackson*, 443 U.S. at 319 (emphasis in original); *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) ("a reviewing court must consider all of the evidence admitted at trial when considering a *Jackson* claim"). Thus, an argument that "direct and circumstantial evidence *against* the jury's verdict is ignored" in a proper *Jackson* sufficiency review "is a misstatement of the law. In a legal-sufficiency analysis, no evidence is 'ignored' because the

Accordingly, while "[w]e are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt . . . we are to ask ourselves whether the trier of fact, acting rationally, could have found the evidence sufficient to establish the element beyond a reasonable doubt." *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1988) (citing *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)). "It is the obligation and responsibility of appellate courts 'to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged.'" *Ross v. State*, 543 S.W.3d 227, 234 n.14 (Tex. Crim. App. 2018), and *Reynolds v. State*, 543 S.W.3d 235, 241 n.10 (Tex. Crim. App. 2018) (both quoting *Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010)); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "[W]e test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Blankenship*, 780 S.W.2d at 207 (citing *Jackson*, 443 U.S. at 318).

### III — Could a Rational Jury Infer Intent to Cause Death?

"Although the question is an exceedingly close one," the court of appeals concluded that a rational jury could find intent to cause death from evidence that Appellant got on top of Molina after the takedown and evidence that Appellant left the scene.

The court of appeals found it important that after Appellant tackled Molina, Appellant got on top of Molina and punched him two or three more times. Citing *Hall v. State*, the court of appeals took this as evidence of striking a helpless victim, which raises an inference that a fatal blow was

---

standard requires a reviewing court to view *all* of the evidence in the light most favorable to the verdict." *Cary v. State*, 507 S.W.3d 750, 759 n.8 (Tex. Crim. App. 2016) (emphasis in original).

struck intentionally or knowingly. *See Hall v. State*, 970 S.W.2d 137, 140 (Tex. App.—Amarillo 1998, pet. ref'd). But while *Hall* did take into account evidence that the defendant struck the victim after the victim was rendered helpless as evidence supporting intent to cause death, the *Hall* court had much more than the additional strikes. The *Hall* court found "ample" evidence, consisting of:

> 1) the disparity in size between [Hall] and Draper, 2) [Hall's] repeated hitting and kicking of Draper as he sat on the ground in a stupor unable to defend himself, 3) [Hall's] yelling at Draper during the assault, 4) the great force of the blows as evinced by [a witness's] ability to hear them from inside her house, 5) [Hall's] attack upon those who interceded, 6) the dire nature of Draper's injuries, 7) [Hall's] callousness towards his victim as evinced by the decision to leave the injured man on the ground and take his car once the beating ended, and 9) [Hall's] resumption of the attack after coming back to the house to retrieve cigarettes.

*Id.* While there are some similarities between *Hall* and this case, the differences between the facts of *Hall* and the facts of Appellant's case are apparent. For instance, Appellant was smaller than Molina. Additionally, Appellant's fight with Molina was, by all accounts, very short-lived, whereas the assault in *Hall* lasted five to fifteen minutes. *Id.* at 139. And, perhaps most significantly, the *Hall* court made sure to note that:

> That the medical expert testified to various possible causes of the resulting head trauma and death does not change our conclusion. This is so because no one presented evidence indicating that Draper fell and struck his head. Nor was evidence presented indicating that anyone other than appellant struck the decedent.

*Id.* at 140. This case has exactly that evidence—Molina fell and struck his head on the sidewalk. This was the sole cause of Molina's death. In contrast, the medical expert in *Hall* opined that the victim in that case, Draper, died from cranial hemorrhaging caused by blows to the head that, although could have been caused by a fall, could have also been caused by a fist or a foot. *Id.* at 139. *Hall* is distinguishable, and the court of appeals erred by relying on it to find intent to cause Molina's death.

The court of appeals also relied on *Phillips v. State* to find intent to cause Molina's death,

based upon evidence that Appellant left the scene, even though he knew that Molina was seriously hurt. *See Phillips v. State*, 216 S.W.2d 213 (Tex. Crim. App. 1948). In *Phillips*, Phillips, the victim, and a third man spent the night drinking in a rural area several miles east of Wichita Falls. *Id.* at 214. Eventually, they got into a "difficulty" and the victim was knocked to the ground. Phillips and the other man then returned to Wichita Falls, leaving the victim lying helpless in an unconscious or semi-unconscious state on the side of the highway. *Id.* The victim's dead body was discovered the next morning in a barrow ditch. *Id.* We noted that the evidence showed that Phillips struck the deceased three or four times with blows of great force, rupturing almost all of the arteries in the brain. *Id.* We also noted that, after knocking the victim down, rendering him helpless and in an unconscious or semi-conscious condition, Phillips dragged the victim to the edge of the road and left him lying there. *Id.* We found that intent to kill could be inferred from those facts. *Id.*

But just as *Hall* is distinguishable from this case, so too is *Phillips*. Unlike in *Phillips*, the fight between Appellant and Molina occurred in the afternoon on a well-traveled road in a residential area, and Appellant did not try to hide Molina's body. Furthermore, the fight occurred in plain view of neighbors and drivers on the road. But of those people, the court of appeals pointed out that "Appellant had no basis to know the bystanders' competence or willingness to assist the downed man." But the evidence showed that Appellant knew the bystanders were willing to assist Molina. A woman on the porch of a nearby house was told to call the police, and two of the witnesses actually called 9-1-1 for help. And not only was help called for, help did arrive and take Molina to the hospital. This case is different from *Phillips*. The fact that Appellant and his friends left Molina on the sidewalk, while bystanders were gathering around and some of which were calling 9-1-1, does not reflect an intent to leave the man for dead.

Instead of being evidence of Appellant's mental state *during the fight*, the evidence that Appellant left the scene reflects his mental state *after the fight*. Indeed, the court of appeals took the fact that Appellant left the scene, in combination with evidence showing that Appellant was later aware that the police were looking for him that evening but stayed home, as evidence of flight. The court of appeals correctly noted that evidence of flight from the scene of a crime is a circumstance from which an inference of guilt may be drawn. Appellant argued that he left the scene because he thought he might get into trouble, but the court of appeals discounted this explanation because "the trier of fact was not required to accept" it.

If the trier of fact was not required to accept that explanation, what other explanation could there be? Fleeing the scene of a crime to avoid getting into trouble is the very reason evidence of flight is relevant and probative of guilt. Evidence of flight shows that the defendant knew that something bad happened and that, because he could get in trouble for it, he ran to avoid getting into trouble. This makes evidence of flight useful to prove guilt where the defendant claims no knowledge of or no involvement in the crime—if he wasn't involved, why would he run and hide?

Appellant's argument, that he left the scene because he thought he might get into trouble, is exactly the inference that can be made from evidence of flight. Such evidence of flight does no more than show that he caused Molina's injury. This was never in dispute. What the evidence of flight does not do is show that Appellant intended to cause Molina's death.

In sum, I disagree with the court of appeals that the evidence was legally sufficient to show that Appellant intended to cause Molina's death.

### IV — Could a Rational Jury Infer Intent to Cause Serious Bodily Injury?

The court of appeals found that intent to cause serious bodily injury could be inferred from

the evidence that Appellant took Molina's legs out from underneath him while on a concrete surface, after which Appellant hit Molina in the face while his head was against the ground. According to the court of appeals, "[t]hese actions raise at least an inference of acting with the conscious objective or desire to create a substantial risk of death through causing serious bodily injury." *Gonzalez*, 2019 WL 1553583 at *8.

The court of appeals's conclusion, I believe, is not based upon a consideration of all of the evidence. The evidence includes not just the fact that Appellant used the takedown move on Molina on an uneven concrete surface, but also evidence showing that Appellant and Medrano regularly used the same takedown move on each other without injury. A rational jury could not conclude that Appellant intended serious bodily injury through the use of the takedown move.

When Medrano was fourteen or fifteen years old, he had trained for five or six months at a boxing gym, and Medrano shared the moves he learned at boxing with Appellant. *Gonzalez*, 544 S.W.3d at 368. Similarly, Appellant showed Medrano judo moves that he learned from taking two to three months of judo classes years before the incident. *Id.* One of the moves involved taking a person down by grabbing their legs, picking them up, and using their own force against them. *Id.* The two would practice and teach each other these skills two to three times a week. *Id.*

While the State presented evidence that Appellant and Medrano had practiced these takedown moves, from which a rational jury could infer that Appellant was aware that the takedown move would cause the other person to fall down, the State failed to present any evidence to show that Appellant knew the move could cause injury, much less serious bodily injury. There was no evidence that Appellant, Medrano, or anyone else was injured as a result of the move before Appellant used the move on Molina in this case. The State also failed to present evidence that Appellant was, at the

very least, aware that using the move could cause an injury, even though the move never did in his personal experience. Instead, the evidence produced at trial showed that the takedown move, while practiced by Appellant and Medrano, did not cause injury, let alone a fatal head injury. Medrano and Appellant's repeated practices of the move upon each other without injury shows that Appellant was unaware that the move could cause serious bodily injury. If Appellant was unaware that the takedown move could cause an injury, how could he have had an intent to cause serious bodily injury through use of that very same move? If, instead, there was evidence that Appellant, while teaching and practicing the move with Medrano, discussed with Medrano about the dangers of the move especially when performed on hard surfaces, the evidence would at least show he was aware of a risk, and a jury could infer that he consciously disregarded the risk by his use of the move on Molina in this case. Of course, such direct evidence of risk awareness is not always available, and awareness of a risk can be inferred from circumstantial evidence.

Justice Rodriguez, in her dissent below, found that Appellant's use of the takedown move on the sidewalk constituted conscious risk creation sufficient to support manslaughter. *Gonzalez*, 2019 WL 1553583 at \*21. But manslaughter, which is defined as the reckless causing of death,[6] requires not only conscious disregard of a risk but also awareness of that risk.[7] Is there circumstantial evidence from which the jury could infer awareness and thus recklessness? Arguably, there is. Appellant and his friends were walking along the concrete sidewalk, and they had to be aware that

---

[6] *See* TEX. PENAL CODE Ann. § 19.04(a) ("A person commits an offense if he recklessly causes the death of an individual.").

[7] *See* TEX. PENAL CODE Ann. § 6.03(c) ("A person acts recklessly . . . with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur.").

the sidewalk was made of concrete. And as discussed above, Appellant was aware that the takedown move would cause the person it is used upon to fall. Thus, while the evidence is insufficient to support murder, the dissent below raises a strong point that the evidence supports manslaughter, at the most. Her suggestion to consider the possibility of reforming the judgment to show a conviction for manslaughter is another reason to grant review.

While the evidence probably shows that Appellant was reckless, it undoubtedly shows that Appellant should have been aware that the moves he practiced with Medrano had the potential to be dangerous. And Appellant should have been aware that performing the move outdoors on a sidewalk was dangerous. But "should have been aware" makes a case for criminal negligence,[8] not intent to cause serious bodily injury.

### IV — Was the Takedown an Act Clearly Dangerous to Human Life?

Even if Appellant caused Molina's death while harboring a specific intent to cause serious bodily injury, such intent alone is not enough to support a conviction for serious-bodily-injury murder under § 19.02(b)(2). The second element of prosecution under § 19.02(b)(2) requires a showing that the individual commits an act clearly dangerous to human life. *Lugo-Lugo v. State*, 650 S.W.2d 72, 81 (Tex. Crim. App. 1983). The character of the act clearly dangerous to human life is measured by an objective standard. *Id.* I have reservations as to whether Appellant's act in this case—the takedown of Molina—meets that standard.

The jury heard evidence that Appellant and Medrano routinely practiced takedown moves with each other without incident. The jury did not hear evidence that the move used by Appellant

---

[8] *See* TEX. PENAL CODE Ann. § 6.03(d) ("A person acts with criminal negligence . . . with respect to . . . the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that . . . the result will occur.").

was inherently dangerous, let alone clearly dangerous to human life. Instead, the jury was presented with evidence that the move was dangerous in this case, performed under the particular circumstance of an uneven concrete surface. Outside of that circumstance, the takedown move was relatively safe, and the evidence presented to the jury proves the point—there was one fatal injury against a context of numerous unremarkable uses of the move without injury.

Nevertheless, the court of appeals concluded that "undercutting someone's feet in a way that they might fall without the ability to brace themselves, and fall on a hard-uneven surface" is an act clearly dangerous to human life. This was in contrast to situations in which the court of appeals apparently would have found the very same takedown move to *not* be an act clearly dangerous to human life, such as "a student felled in a padded Judo studio, or a gridiron running back who is protected by padding and expecting a tackle." *Gonzalez*, 2019 WL 1553583 at \*9. The court of appeals's approach, finding that the takedown move is an act *clearly* dangerous to human life under the specific circumstances of this case while on the other hand acknowledging that the same act is safe in other circumstances, warrants review.

### V — Conclusion

In conclusion, I would grant Appellant's petition. The evidence in this case is, from the record before us, insufficient to support a rational jury conclusion that Appellant intended to cause death or intended to cause serious bodily injury, and the evidence may also be insufficient to support a conclusion that Appellant's takedown of Molina was an act clearly dangerous to human life. Because the Court refuses review, I respectfully dissent.

Filed: April 8, 2020

Do Not Publish